*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

# UNITED STATES BANKRUPTCY COURT

# EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re | ) | Case No. 14-91565-E-7 |
| | ) | Docket Control No. HSM-10 |
| RICHARD CARROLL SINCLAIR, | ) | |
| | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case, the rules of claim preclusion or issue preclusion, or for persuasive value.**

## MEMORANDUM OPINION AND DECISION[1]

Though the Memorandum Opinion and Decision ("Decision") of this bankruptcy court is long and detailed, this court's conclusions are straightforward. The Chapter 7 Trustee has made his case for the Motion for Approval of Compromise of Controversies ("Motion") to be granted. Richard Sinclair, the Chapter 7 Debtor ("Debtor-Sinclair") has not provided the court with a credible basis to not approve the settlement. None of Debtor-Sinclair's natural allies oppose the Motion. This court grants the Motion and authorizes Gary Farrar, the Chapter 7 Trustee ("Bankruptcy

---

[1] The Motion for Approval of Compromise has been set for hearing on the notice required by Local Bankruptcy Rule 9014-1(f)(1). Sufficient Notice has been given as required by Federal Rule of Bankruptcy Procedure 2002 and Local Bankruptcy Rule 9014-1(f)(1). Failure of the respondent and other parties in interest to file written opposition at least fourteen days prior to the hearing as required by Local Bankruptcy Rule 9014-1(f)(1)(B) is considered to be the equivalent of a statement of nonopposition. *Cf. Ghazali v. Moran*, 46 F.3d 52, 53 (9th Cir. 1995) (upholding a court ruling based upon a local rule construing a party's failure to file opposition as consent to grant a motion). The defaults of the non-responding parties and other parties in interest are entered.

Trustee"), to enter into and consummate the settlement and compromise with Capital Equity Management Group, Inc., formerly known as California Equity Management Group, Inc.; New Century Townhomes of Turlock Owners Association, formerly known as Fox Hollow of Turlock Owners' Association; and Andrew B. Katakis (collectively "Katakis et al.").

In this bankruptcy case, filed more than two years ago, the Bankruptcy Trustee, other creditors, and this court continue to be sucked into the Debtor-Sinclair/Katakis et al. "Litigation Vortex" which has consumed thousands of hours of the lives of the parties, thousands of pages of pleadings, and large amounts of time for judges, justices, and court staff in the United States District Court for the Eastern District of California, the California Superior Court, the California Court of Appeal, and now this court. For Debtor-Sinclair, no judgment or order of any court is ever final. For his nemesis, Katakis et al., there is no litigation that they are able to enforce as a final judgment. Rather, it has become an unending avocation of litigation for these parties.

Debtor-Sinclair did not end up in bankruptcy by accident. He was not forced into bankruptcy by his nemesis or other creditors through the commencement of an involuntary bankruptcy case. Debtor-Sinclair chose to voluntarily file this bankruptcy case, seeking to use Chapter 11 of the Bankruptcy Code and a bankruptcy judge to "overrule" United States District Court judges, California Superior Court judges, and California District Court of Appeal justices.

As discussed below, Debtor-Sinclair is an experienced, highly educated, knowledgeable lawyer and business person. However, his conduct in this bankruptcy case has demonstrated a willingness to not be bound by the law or facts. One example of such conduct is Debtor-Sinclair's attempt to have this bankruptcy judge purport to vacate orders and judgments issued by district court and state court judges and justices. Debtor-Sinclair provided an extensive twelve-page discussion of federal judicial power to address fraud on a court in his Request to Set Aside Judgment and Opposition ("Request and Opposition") to the Katakis et al. motion to convert this case. The request portion of the pleading stated that,

> **The Bankruptcy Court should** deny the motion [to convert the case] and **set aside judgments**[.]

Request and Opposition, p. 11:22; Dckt. 87 (emphasis added). Debtor-Sinclair then further stated

in the Request and Opposition:

> This court should not assist Andrew Katakis and Greg Durbin in their fraud on the Court and should not assist Andrew Katakis in his 80 Unclean Hands and 2 Criminal Foreclosure Frauds. **The court should set aside all awards to Andrew Katakis for his wrongdoing**.

*Id.*, p. 37:6-9 (emphasis added).

The judgments Debtor-Sinclair sought to have this court set aside include the $1,200,000.00 state court judgment (California Superior Court, Stanislaus County Case No. 332233, the "2003 State Court Action") obtained by Katakis et al., which judgment has been affirmed on appeal. The court addressed the impropriety of such attempts by Debtor-Sinclair to have this court purport to vacate orders and judgments of other courts at the February 26, 2015 hearing on the Katakis et al. motion to convert and in the Civil Minutes (Dckt. 113) for that hearing. In describing the litigation strategy of Debtor-Sinclair, this court stated:

> The Debtor's [Debtor-Sinclair's] opposition provides no clarification but instead adds further confusion to what appears to be a convoluted and complicated history in the courts. Debtor's mountain of documents in opposition and the vague, general request that this court vacate judgments and order of other courts lends credibility to Movants contention that nothing productive can come of this Chapter 11 case while the Debtor in Possession [Debtor Sinclair] remains in control of the estate.

Civil Minutes, Dckt. 113 at 5.

Though reservations were stated by this court, Debtor-Sinclair was allowed to "run the show" as the debtor in possession in this bankruptcy case for a year before the case was converted to one under Chapter 7. The court hoped that Debtor-Sinclair would focus on the prosecution of his bankruptcy case and take advantage of his rights under the Bankruptcy Code, rather than attempting to misuse this bankruptcy court as another forum to relitigate final ruling and judgments from other courts.

When Debtor-Sinclair realized that this court would not relitigate issues for which judgments and orders issued by other courts and would not purport to vacate judgments and orders of other courts, he quickly (seven days later) filed a motion to dismiss this bankruptcy case. Dckt. 116. In denying the motion to dismiss this bankruptcy case, this court stated that in light of Debtor-Sinclair admitting to having made a number of transfers of his assets to a trust and several limited liability

1    company, and purporting to making such trust "irrevocable" (while the Katakis et al. and Debtor-

2    Sinclair were proceeding through more than a decade of litigation), dismissal of the bankruptcy case

3    at that time was improper. Though this court denied the dismissal, Debtor-Sinclair was allowed to

4    continue in control as the debtor in possession to run the Chapter 11 case and seek proper relief

5    under the Bankruptcy Code.

6        Because the only opposition to the Motion is that of Debtor-Sinclair, and in large part rests

7    on his legal arguments and personal opinions, the court in this Decision reviews the litigation

8    practices and conduct of Debtor-Sinclair in this case, as well as referencing other judicial and

9    California State Bar proceedings and decisions.

10       After receiving Debtor-Sinclair's opposition ("Opposition") to this Motion, this court issued

11   an Order for Supplemental Briefing. Dckt. 499. The court requested Debtor-Sinclair to address

12   what appear to be factually inaccurate statements in the Opposition and for the Bankruptcy Trustee

13   and Katakis et al. to address issues relating to the effect of the release on Debtor-Sinclair. In the

14   Order for Supplemental Briefing, this court also offered the opportunity for Debtor-Sinclair and the

15   transferees of what has been represented to be millions of dollars of assets in "*bona fide*," and "good

16   faith" transfers (as characterized by Debtor-Sinclair) to present to the court and the Bankruptcy

17   Trustee a $40,000.00 offer to purchase the claims being settled–effectively seeking a right of first

18   refusal.

19       While there can be much debate over the credibility of Debtor-Sinclair's opinions of what

20   claims may exist, which final state court judgments and orders may someday be vacated, and the

21   (ever increasing) value of claims against Katakis et al., a third-party putting up money today is

22   something that this court could find as a significant statement on the issue of value. Mrs. Sinclair

23   (Debtor-Sinclair's spouse), Kathryn Machado, PhD (trustee of the Richard Sinclair Trust and

24   managing member of limited liability companies), and the Sinclair Children who are all transferees

25   or beneficiaries of the transfers, were afforded the opportunity to come forward with Debtor-Sinclair

26   and make such $40,000.00 offer to the Bankruptcy Trustee if they concurred in Debtor-Sinclair's

27   valuation of the claims against Katakis et al. For his sister, Dr. Machado, she has been working

28   extensively with Debtor-Sinclair prior to and during this case in her capacity as trustee of the

Richard Sinclair Trust  and managing member of the transferee limited liability companies.  Dr. Machado is no stranger to these bankruptcy proceedings.

If, as Debtor-Sinclair argues, these claims have a value of $40 Million, then the Richard Sinclair Trust, the limited liability companies, or Mrs. Sinclair should readily "buy a piece of the action" and turn $40,000.00 into $20 Million (presuming they would split with Debtor-Sinclair the substantial recovery from continuing the litigation with Katakis et al.).  If Mrs. Sinclair, Dr. Machado, and the Sinclair Children make the economic decision that it is not worth $40,000.00 to buy a piece of, or all of, these claims that Debtor-Sinclair thinks are so valuable, that is the marketplace at work, providing the court with real time economic data.

## REVIEW OF MOTION AND OPPOSITION

The Bankruptcy Trustee requests that the court approve a compromise and settlement with Katakis et al. of their respective competing claims.  The claims and disputes to be resolved  relate to state court and federal district court actions by and between Katakis et al. (which judgments, claims and rights have been asserted by Katakis et al. as claims in this bankruptcy case) and Debtor-Sinclair (which claims and rights are property of the bankruptcy estate).

The Bankruptcy Trustee and Katakis et al. have resolved these claims and disputes, subject to approval by the court on the following terms and conditions as summarized by the court (the full terms of the Settlement are set forth in the Settlement Agreement filed as Exhibit A in support of the Motion, Dckt. 481):

A.    The term "Settled Claims" is defined in the Settlement agreement (¶ E) to be:

1.    "Trustee and the Bankruptcy Estate, on the one hand, and each of the [Katakis et al.] Creditors on the other hand, now desire to confirm the terms of their settlement of all claims and disputes each may have against the other, **which claims include, but are not limited to, any and all claims,** debts, liabilities, rights, obligations, loss, costs, expenses or causes of action, including attorney's fees, of any kind or nature, whatsoever, **known or unknown**, foreseen or unforeseen, accrued or unaccrued, **which they may have against the other** or the others' officers, directors, shareholders, owners, employees, agents, predecessors, successors, affiliated companies, attorneys, assigns and beneficiaries, save and **except** that this Agreement and the **Releases** contained herein **shall not in any way apply** to or affect any of the **rights and claims** asserted by any **of the [Katakis et al.] Parties** in their **Proof of Claim 4-1** filed in the Bankruptcy Estate, or asserted by either or both of **CEMG and Fox Hollow HOA in their Proof of Claim 26-1** filed in the Bankruptcy Estate (the 'Settled Claims')."

Proof of Claim 4, as amended June 3, 2016, asserts an unsecured claim in the amount of $1,066,530.52, which is based on the judgment obtained by Katakis et al. in the 2003 State Court Action.  Proof of Claim No. 26, as amended June 3, 2016, asserts a claim in the amount of $7,847,292.08, plus attorneys' fees and costs, which is sought in the pending action in the United States District Court for the Eastern District of California, Case No. 1:03-cv-054391; 03-cv-05439.

B.    Somebody (the source is unidentified in the Settlement Agreement) is to pay the Bankruptcy Trustee $20,000.00.

At the December 15, 2016 hearing, counsel for Katakis et al. identified California Equity Management Group, Inc. as the person making both $20,000.00 payments due under the Settlement Agreement.

C.    Upon receipt of the $20,000.00, the Bankruptcy Trustee shall provide a general release of the Estate's interests in the settled claims against any one or more of Katakis et al. and any of their officers, directors, shareholders, owners, employees, agents, predecessors, successors, affiliated companies, attorneys, assigns, and beneficiaries, including but not limited to any claim of the Estate arising out of the RICO action or any right of the Estate to appeal the judgment of the RICO action.

D.    Except as stated in paragraph 6 of the Settlement Agreement, Katakis et al. (the Settlement Agreement does not state "and each of them") provide a General Release to:

1.    The Bankruptcy Estate;
2.    The Bankruptcy Trustee, and
3.    The Bankruptcy Trustee's Professionals, and agents; of

all known or unknown, foreseen or unforeseen, and accrued or unaccrued, claims, rights, and liability, including but not limited to the "Settled Claims."

At the December 15, 2016 hearing, counsel for Katakis et al. confirmed that the General Release is granted individually by each of the Katakis et al. parties and it is not merely a release of whatever claims that the Katakis et al. parties may jointly hold or assert.

E.    The state court action for the Malicious Prosecution Action (California Superior Court, Stanislaus County Case No. 668157), including the claims and cross-claims of the parties, and its related proof of claim filed in this bankruptcy case by Katakis et al. is finally and completely resolved as follows:

1.    The state court action shall be dismissed with prejudice, with each of the parties bearing its own attorneys' fees and costs of litigation;

2.    Katakis et al. will irrevocably withdraw Proof of Claim No. 7-1 (filed in an estimated amount of $1 Million), associated with the state court action, within ten days of dismissal of the state court action.  Mr. Katakis, Capital Equity Management Group, and any other entity in which Mr. Katakis has

1    an interest, agree not to refile such proof of claim or any future proof of
     claim arising from the same facts alleged in Proof of Claim No. 7-1; and

2

3    3.    Capital Equity Management Group, Inc. and New Century Townhomes of
           Turlock Owners Association shall make an additional payment of $20,000.00
           to the Estate on settlement of Debtor-Sinclair's cross-claims in the state court
4          action, which is in addition to the payment referenced in this settlement and
           which shall be allocated between the Estate and Debtor-Sinclair according
5          to respective interests.  Katakis et al. shall be responsible for drafting the
           pleadings to dismiss the state court action.  The $20,000.00 payment to the
6          Estate shall be paid within ten days after entry of the order of the Stanislaus
           Superior Court dismissing the state court action in its entirety.  The Estate
7          waives all rights to appeal that dismissal.

8         This provision makes reference to settlement of "Mr. Sinclair's" cross-claim and not "claims

9    of the estate which are identified in the proposed fourth amended complaint which Mr. Sinclair

10   seeks to file if those rights are abandoned to him from the bankruptcy estate."  It may be a simple

11   drafting shortcut, but it was not clear to the court prior to the hearing whether the payment of the

12   $20,000.00 to the estate is dependent on the "settlement" of rights held by someone other than the

13   bankruptcy estate and the Bankruptcy Trustee.

14        At the December 15, 2016 hearing on this Motion, Katakis et al. stated that claims of the

15   estate that are the subject of this part of the settlement are those stated in the proposed fourth

16   amended complaint and such clarification is to be stated in the order approving the Settlement.

17   F.    The Bankruptcy Trustee and Katakis et al. agree that the settlement shall act as a full
           and final release of all claims, known or unknown, whether or not asserted, arising
18         from the alleged claims and causes of action referenced.  If the facts supporting the
           settlement are found to be different than now believed, each party expressly accepts
19         and assumes the risks of such possible difference in facts and agrees that the
           settlement shall remain effective.
20

21   G.    Any and all rights under California Civil Code § 1542 are waived.

22   H.    All Proofs of Claim filed by Katakis et al. currently on file shall remain in full force
           and effect, except for Claim No. 7-1, and the Bankruptcy Trustee shall not file an
23         objection to said claims.

24        The claims not included in the release appear from the Settlement Agreement to be Proof of

25   Claim 4 and Proof of Claim 26, as amended June 3, 2016.  But this provision of the Settlement

26   Agreement intimates that there could be others beyond that from this court's review of that

27   Agreement prior to the hearing.

28        At the hearing, counsel for Katakis et al. confirmed that Proofs of Claims Nos. 4 and 26 are

the only two claims that will be asserted by the Katakis et al. in this bankruptcy case.

> I.      Katakis et al. shall not seek allowance of an administrative claim based on attorneys' fees and costs incurred by Katakis et al. that may have benefitted the Estate.

To consider this Motion and whether settlement for the bankruptcy estate is appropriate the court must consider not only the opposition asserted by Debtor-Sinclair, but also the totality of the circumstances in this bankruptcy case and how it fits into the decades of disputes and litigation between Debtor-Sinclair and Katakis et al.

**Debtor-Sinclair's Opposition**

Debtor-Sinclair filed an Opposition on December 1, 2016. Dckt. 487. The short version of his Opposition is that Debtor-Sinclair asserts the settlement is not fair and equitable because: (1) he was not included in the compromise, and (2) the settlement amount of $40,000.00 is too low because he claims the bankruptcy estate has claims totaling at least $40 Million. Specific points made by Debtor-Sinclair in the 17-page, single spaced, Opposition include:

> A.      Debtor-Sinclair has been left out of the settlement. It is only Debtor-Sinclair "who knows the debtors [sic] side of the story and proof."
>
> B.      The settlement of $40,000.00 is only 1/1000 of the $40 Million that Debtor-Sinclair now states that these claims are worth.
>
> C.      Debtor-Sinclair has filed a "60d" motion in the state court, but was blocked by Katakis et al. because the Bankruptcy Trustee was not prosecuting the motion.[2]
>
> D.      For this court to approve the proposed settlement, this court must effectively "try" the underlying validity of the claims asserted by the estate, for which Debtor-Sinclair must first obtain an order vacating the final judgment in the state court.
>
> E.      Debtor-Sinclair has offered the Bankruptcy Trustee 15% of whatever may be recovered by Debtor-Sinclair's prosecution of the claims (which date back to at least 2009 without having been effectively prosecuted by Debtor-Sinclair), but the Bankruptcy Trustee rejected his promise of later payment if any recovery is obtained by Debtor-Sinclair.

///

---

[2] Presumably the reference is to Federal Rule of Civil Procedure 60(d), allowing a federal judge to set aside a judgment or order in action before that judge due to fraud. Such Federal Rule would not apply in state court. While Debtor-Sinclair may just be short-handing his reference to a court's power to vacate orders or judgments in that court, such inaccurate statements of the law pervade Debtor-Sinclair's pleadings and arguments to the court.

F.    Debtor-Sinclair states that this court's tentative ruling from August 25, 2016, determines that he has an interest in the claims superior to the estate.[3]

G.    Debtor-Sinclair wants to prosecute a fourth amended complaint against Katakis et al.

H.    Exhibit 1 to the Opposition is a letter dated January 27, 2003 in which Debtor-Sinclair states that claims exist against Katakis et al., accusing Katakis et al. of committing extortion and other crimes.  (January 27, 2003, is almost fourteen full years before the present hearing on December 15, 2016.)

Debtor-Sinclair also argues that it would be unfair for the court to make Debtor-Sinclair bid on the asset (the claims being settled) against his nemesis, Katakis et al.–which nemesis Debtor-Sinclair states has vowed to use its $60 million fortune to take Debtor-Sinclair down.  Therefore, the Motion should be denied.

**The Bankruptcy Trustee's Reply to**
**Debtor-Sinclair's Opposition**

The Bankruptcy Trustee filed a reply to Debtor-Sinclair's Opposition on December 8, 2016.  Dckt. 503.  The Bankruptcy Trustee notes that Debtor-Sinclair listed on Schedule B filed in his bankruptcy case the value of $6 Million for his claims against Katakis et al. and "Truax," not the $40 Million he now asserts in Opposition to the Motion.  The Bankruptcy Trustee responds to Debtor-Sinclair's allegations that the Bankruptcy Trustee did not analyze settlement fair and equitably by showing that the Motion analyzes each factor individually, concluding that all the factors favor settlement.  Additionally, the Bankruptcy Trustee asserts that settlement is an area where not every single disputed legal and factual issue is adjudicated.  Instead, bankruptcy judges determine whether a proposed settlement is within the range of settlements appropriate in a given

---

[3]  As discussed in this Decision, this court's prior *tentative* ruling did not so state, and the portion of the *tentative* ruling referenced by Debtor-Sinclair is merely the section in which the court summarizes the opposition filed to that motion by Debtor-Sinclair.  The failure of Debtor-Sinclair, an experienced, highly educated, self-admitted excellent attorney to cite to the court's actual final ruling (Dckt. 455) and to mis-cite the court to that portion of the *tentative* ruling which clearly is just summarizing the arguments of Debtor-Sinclair cannot be a mistake.  Rather, it is consistent with the litigation strategy of Debtor-Sinclair to say and assert whatever is in his interest, and deny, delay, and attempt to re-argue extraneous matters and attempt to mislead the court into relitigating matters which are the subject of prior final rulings and orders of other courts.

1  case, with weight given to a trustee's business judgment (citing *In re Equity Funding Corp.*, 519

2  F.2d 1274, 1277 (9th Cir. 1975); *In re Rake*, 363 B.R. 146 (Bankr. D. Idaho 2007)).

3      The Bankruptcy Trustee notes that the Opposition fails to address any issue of setoff by

4  Katakis et al. for their claims and judgments against Debtor-Sinclair. The potential setoff is a factor

5  taking into account by the Bankruptcy Trustee's decision-making process. The Bankruptcy Trustee

6  also points out that the Opposition incorrectly states that this court previously determined that the

7  state court action is exempt in bankruptcy. Regardless, exemption is distinct from the settlement.

8  If settlement is approved, Debtor-Sinclair will then have to prove what portion, if any, of the

9  settlement attributable to the state court litigation is exempt.

10      The Bankruptcy Trustee goes further, stating that he does not purport to bind Debtor-

11  Sinclair. The settlement requires the dismissal of the state court action, which is defined as

12  encompassing both claims made by Katakis et al. against Debtor-Sinclair and cross and counter-

13  claims made by Katakis et al. and Debtor-Sinclair against the other.

14      In his response, the Bankruptcy Trustee does not address if and how the releases obtained

15  by the Bankruptcy Trustee may apply to Katakis et al.'s claims that have been released and

16  withdrawn from the bankruptcy case after the Bankruptcy Trustee closes the case.

17                    **ORDER FOR SUPPLEMENTAL STATUS REPORTS**

18      This court ordered Debtor-Sinclair and the Bankruptcy Trustee to file supplemental status

19  reports by December 12, 2016, addressing the court's points, if they so desired. Dckt. 499. For

20  Debtor-Sinclair, the court requested that he: (1) Identify provisions of the settlement by which

21  Debtor-Sinclair asserts that he is not included; (2) Address why the $40 Million asserted valuation

22  of his claim is credible and how he has diligently prosecuted such rights; (3) Address whether

23  Debtor-Sinclair, Debtor-Sinclair's wife (Mrs. Sinclair), Debtor-Sinclair's sister (Dr. Machado), and

24  Debtor-Sinclair's children have offered the Bankruptcy Trustee $40,000.00 to match the settlement

25  offer or will have $40,000.00 in certified funds available at the December 15, 2016 hearing as an

26  offer in the nature of a right of first refusal by them; (4) Identify what courts do not want to decide

27  the merits of a "60d motion" and what legal authorities exist for a bankruptcy judge to set aside

28  judgments and orders of other federal and state; and (5) Identity the specific tentative rulings in

which this court stated that such judgments could be avoided, that Debtor-Sinclair's Fifth and Fourteenth Amendment rights were violated, or that Debtor-Sinclair has an exemption in the claims being settled.

The court requested that the Bankruptcy Trustee: (1) Respond to the allegation that the settlement excludes Debtor-Sinclair; (2) Identify over-encumbered properties, liens, and date of the secured obligations on the transferred properties; (3) Address how the Bankruptcy Trustee anticipates litigation with Debtor-Sinclair, who has been disbarred as an attorney, if the Bankruptcy Trustee is suing third party transferees; and (4) Advise this court whether the Bankruptcy Trustee has reported any threatening or improper hindrance in the performance of the Bankruptcy Trustee's duties to the U.S. Trustee for review.

The court also afforded Katakis et al. the opportunity to address: (1) The scope of the release; (2) Debtor-Sinclair's status upon closing the bankruptcy case when he succeeds to the Bankruptcy Trustee; (3) The dismissal of all claims against the bankruptcy estate; (4) The effect of California Civil Code § 877; and (5) Debtor-Sinclair's contention that the settlement would strip him of all the claims he asserts against the settling parties but subject Debtor-Sinclair to further litigation and liability for all of the release and dismissed claims for his predecessors in interest– the Bankruptcy Trustee and the bankruptcy estate.

**Debtor-Sinclair's Supplemental Responses**

No supplemental responses were filed by Debtor-Sinclair.

**Trustee's Supplemental Responses**

The Bankruptcy Trustee filed a Supplemental Status Report on December 12, 2016. Dckt. 514. The information in that Report is summarized as follows. First, the Trustee reports that Debtor-Sinclair and Deborah Sinclair are legally married, not divorced as indicated in other pleadings filed in this case.

He confirms that Debtor-Sinclair made a non-cash offer, based on future litigation by Debtor-Sinclair to vacate the existing final judgment against Debtor-Sinclair (2003 State Court Action judgment) and future litigation of the claims asserted to exist by Debtor-Sinclair.

The Bankruptcy Trustee also provides information about his inspection of the transferred

properties and use of real estate professionals in determining possible values for the bankruptcy estate. The Bankruptcy Trustee reports that he has attempted to engage counsel with respect to possible avoidance actions, but based on their review no such employment was possible.

The Bankruptcy Trustee reports that the settlement agreement resolves the bankruptcy estate's interest and provides for Proof of Claim No. 7 to be withdrawn. The settlement does not include Debtor-Sinclair directly. The extent of the settlement and Debtor-Sinclair's status is stated by the Bankruptcy Trustee to be an issue between Debtor-Sinclair and Katakis et al. The Bankruptcy Trustee does not address what impact, if any, it may have for Debtor-Sinclair after the close of the bankruptcy case.

The Bankruptcy Trustee also reports that his consideration takes into account the litigation undertaken by Debtor-Sinclair when he was a licensed attorney, and the possible litigation that would ensue in connection with any actions taken by the Bankruptcy Trustee. In light of the low value of the assets at this time, the costs of potential protracted litigation are not justified by such value.

The final point to be addressed is whether the Bankruptcy Trustee believes he has been threatened or improperly hindered from fulfilling his duties, and if so, whether such has been reported to the U.S. Trustee. The Bankruptcy Trustee responds that he has taken into account the costs of litigation and the litigious nature of Debtor-Sinclair and his family members, but has not been threatened or unduly influenced by any persons in the performance of the Bankruptcy Trustee's duties.

**Supplemental Status Report by Katakis et al.**

On December 12, 2016, Katakis et al. filed a Supplemental Status Report. Dckt. 516. It is reported that Katakis et al. desire to bring an end to the 13 years of litigation and settle any possible causes of action that Debtor-Sinclair could have against Katakis et al.

Katakis et al. state that they are willing to clarify the terms of the settlement to grant Debtor-Sinclair a release for all claims - except the 2003 State Court Action judgment ($1,066,530.52) and whatever judgment is issued in the District Court Action, 053-cv-04539, Eastern District of California. Whether such obligations survive the bankruptcy discharge will be determined in the

two nondischargeability actions and the objection to discharge being pursued by these settling creditors.    With respect to any contentions by Debtor-Sinclair that he may assert an exemption in the various claims that are being settled, that has been previously addressed by this court, with the exception of an asserted "personal injury" exemption, which will be determined by the court in a pending objection to claim of exemption.

Katakis et al. assert that to the extent Debtor-Sinclair is not included in the release, liability for any possible claims would exist only: (1) to the extent they were determined nondischargeable or Debtor-Sinclair was denied his discharge (with Katakis et al. currently prosecuting adversary proceedings to have both determined against Debtor-Sinclair); and (2) only for claims which have not been determined in the existing judgment and the pending District Court Action, and then only to the extent that the applicable statutes of limitations have not expired.

### LEGAL ABILITY AND KNOWLEDGE, AND FINANCIAL KNOWLEDGE OF RICHARD SINCLAIR

It is only Debtor-Sinclair opposing the Motion, asserting his personal and professional opinion that the claims of the estate have a value of $40 Million.  Further, that it is he, Debtor-Sinclair, who will successfully prosecute in the future such claims.  Nobody else has surfaced in opposition.  In weighing the Motion and Opposition, the court considers Debtor-Sinclair's abilities and credibility not only as a party, but also as an attorney.

The court's consideration of the credibility of Debtor-Sinclair begins with whether the court concurs with Debtor-Sinclair's repeated representations to this court that he is a highly educated, accomplished attorney and businessman. He has stated to the court that not only does Debtor-Sinclair hold a Juris Doctorate degree and was previously licensed as an attorney in California, but he also was awarded an L.L.M. in taxation and has been involved in big dollar legal and real estate deals.  Though now disbarred (he blames his financial failures and the loss of his law license on the bad conduct of Katakis et al.), Debtor-Sinclair did practice law for forty years according to California State Bar records.[4]

Attached to this Ruling in Appendix A is this court's review of some of the statements,

---

[4]  http://members.calbar.ca.gov/fal/Member/Detail/68238.

representations, and legal pleadings made and filed by Debtor-Sinclair in which he advances the position that he is a knowledgeable, well-educated attorney and business person.

The court accepts Debtor-Sinclair as a very intelligent person, who has sophisticated business knowledge and a very extensive knowledge of the law. To the extent that Debtor-Sinclair makes representations to the court, advances legal arguments, files evidence, and advocates positions, the court finds that he does so intentionally and with full knowledge of the law and the merit, or lack of merit, of what he is trying to do.

This conduct, including the use and misuse of the law and judicial proceedings, has not served Debtor-Sinclair well, ultimately leading to losing his law license. Some of the proceedings and actions in which other courts and the State Bar addressed Debtor-Sinclair's conduct are discussed in this Decision below.

### RULINGS OF OTHER COURTS AND THE CALIFORNIA STATE BAR CONCERNING THE CONDUCT OF DEBTOR-SINCLAIR

The court has been presented with rulings of other courts concerning the conduct of Debtor-Sinclair, both as a party and an attorney. These the rulings of other courts in this section of the Decision are for general informational purposes and to put the present bankruptcy case in context of the long history of litigation between Katakis et al. and Debtor-Sinclair. The court does not give evidentiary weight or fact determination (such as collateral estoppel or res *judicata*) to these rulings of other courts. However, it is interesting to note that other courts and the California State Bar have reached similar conclusions as to Debtor-Sinclair's concepts of good faith, proper litigation practices, and prosecution claims in judicial proceedings. To the extent that an appellate court reviews this Decision, it will have the benefit of those other proceedings identified herein.

The court's review of these rulings of other courts and the State Bar are attached as Appendix B. These matters are *Fox Hollow of Turlock Owner's Association v. Mauctrst, LLC, et al.*, E.D. Cal. No. 1:03-CV-05439, Dckt. 1184 ("Dist. Ct. Case 03-5439"); and California State Bar Proceedings *In the Matter of Richard C. Sinclair*, Case Nos. 13-O-10657-PEM, 13-O-11618 (Cons.).

### DEBTOR-SINCLAIR'S ASSERTED DISABILITY, FAILURE TO PRODUCE CREDIBLE EVIDENCE OF ANY ALLEGED DISABILITY, AND DETERMINATION BY THE BANKRUPTCY COURT THAT DEBTOR-SINCLAIR

**IS LEGALLY COMPETENT IN THIS BANKRUPTCY CASE**

In this bankruptcy case, the court was presented with Debtor-Sinclair's purported "disability" and his demand that all proceedings be stayed. Initially, the "disability" was stated to be only for a short period of time. Then, as the case was not progressing as Debtor-Sinclair desired, the "disability" became more open-ended.

On July 28, 2016, Debtor-Sinclair filed a document titled "Status - 2004 Examinations and Court Orders" ("2016-07 Disability Notice"). Dckt. 220. In the 2016-07 Disability Notice, Debtor-Sinclair stated that Debtor-Sinclair: (1) totaled his car on July 11, 2015, and (2) suffered a concussion and was required to get seventeen staples in his head, and would need a one-month extension in the court ordered discovery. *Id.* No copies of hospital emergency room records, doctor records, or any declarations (other than Debtor-Sinclair himself) were provided in support of the asserted disability.

The court continued the discovery to afford Debtor-Sinclair the opportunity to seek the necessary medical and legal assistance to allow for the continued prosecution of this as a Chapter 11 case.

On August 3, 2014, Debtor-Sinclair filed a Status Report in response to the U.S. Trustee's Notice of Non-Compliance ("2015-08 Status Report"). Dckt. 222. Debtor-Sinclair stated that the accident impeded his ability to provide the U.S. Trustee with required documents and information.

On September 8, 2016, Debtor-Sinclair filed a Declaration, Notice of Disability, and Status Report ("2016-09 Status Report"). Dckt. 244. In it Debtor-Sinclair states that he will "soon be competent to testify," but that his examination needs to be delayed further.

While in the report stating that he was and had been "disabled," Debtor-Sinclair continued to file various documents asserting that the proceedings needed to be delayed. Though "disabled" to an extent asserted to preclude his being examined as provided in Federal Rule of Bankruptcy Procedure 2004, Debtor-Sinclair not only provided this notice, but also a detailed points and authorities asserting with extensive citations why he could seek to have his examination delayed. No declaration from any doctor or authenticated evidence (other than Debtor-Sinclair's self-serving statements) of any medical impairment was presented to the court.

In ruling on the Katakis et al. motion to have Debtor-Sinclair found in contempt for failing to comply with the orders of the court compelling discovery, the court's findings include the following:

> Mr. Sinclair has twice stated under penalty of perjury that since his automobile accident in July 2015 that he is not mentally able to participate in this case as the debtor or as the debtor in possession. **However, these statements are suspect because they are made at a time Mr. Sinclair states he is unable to fulfill the obligations of a party in this case and the fiduciary obligations as the Debtor in Possession** to the impairment. For the court to order a party who has stated that he is not legally competent to do something is only inviting even more litigation between these parties.
>
> At the hearing, Richard Sinclair and explained that he believes he had a stroke, which caused his car to go into a ditch. He further believes that by the end of October he could be able to participate in the bankruptcy case and adversary proceedings. **However, the only medical information provided** by a doctor **is** the **"Mr. Sinclair should** be able to **return to work/school** August 31, 2015." The court addressed with Mr. Sinclair the need for the court to be satisfied that he is legally competent, or to appoint a personal representative. The court requested that Mr. Sinclair's doctor provide a professional opinion declaration concerning Mr. Sinclair's condition and legal competency (as a represented party or as pro se party).

October 1, 2015 Civil Minutes, p. 5; Dckt. 261 (emphasis added).

When Debtor-Sinclair failed to provide credible evidence of a medical impairment, the court issued a supplemental order for Debtor-Sinclair to file competent medical testimony of any disability, which evidence would be filed under seal. October 9, 2015 Disability Evidence Order ("DEO"), Dckt. 275. The grounds stated in the DEO which led to its issuance include:

A.  "To corroborate Mr. Sinclair's testimony [declaration], a hearsay document is attached to the Declaration-Points and Authorities-Exhibit Document filed on September 8, 2015. This is a two sentence form which has the names of two doctors, two nurse practitioners, an address, phone number, and fax number centered at the top of the page. It has the typed name Upinder K. Basi, MD and date on the signature line. There is illegible writing scrawled diagonally under the typed name." DEO, p. 2:8-15.

B.  "The pre-printed text [on the hearsay document] states, 'Please Excuse [Blank Field No. 1] From work/school due to illness for the following dates: [Blank Field No. 2] May return on [Blank Field No. 3] with/without restrictions.' For the Blank Field No. 1, the name 'Sinclair, Richard' is typed in. For Blank Field No. 2 the dates '8/31/15-9/30/15' is typed in. Finally, for Blank Field No. 3 the date '10/1/15' is typed in." *Id.* at 16-22.

C.  "The court is further concerned that Mr. Sinclair may not be able to fully communicate Dr. Basi's concern and prognosis for when Mr. Sinclair will be legally competent to personally continue in these proceedings. The two sentence form provides little information." *Id.*, p. 3:11-15.

D.  "It says nothing about Mr. Sinclair's legal competence, but merely that he should be excuses [sic] from work or school. Legal proceedings are neither work nor school." *Id.*, p. 3:15-17.

E.  In the DEO, the court:

"[r]equests that Upinder K. Basi, M.D., the person identified as signing a form stating that Richard Sinclair should be excused from "work/school due to illness" provide a written declaration under penalty of perjury providing the court with the nature, scope, and projected duration of the "illness."" *Id.*, p. 5:16-21.

F.  Further, in the DEO the court:

"[r]equests that Dr. Basi also provide [her] professional opinion and medical diagnosis of: (1) the legal competency of Mr. Sinclair to proceed in this bankruptcy case, both as a party and a *pro se* party representing himself; (2) the basis for determining that he should be excuses from work or school activities until September 30, 2015; (3) any concerns, limitations, or inabilities of Mr. Sinclair to proceed as a party or in representing himself in these legal proceedings; (4) and any other factors, limitations, conditions, or matters which Dr. Basi believes the court should consider in determining how these judicial proceedings will be conducted, Mr. Sinclair's ability to participate as a party, the need of the court to appoint a personal representative in the place of Mr. Sinclair, and Mr. Sinclair being able to represent himself." *Id.*, p. 5:21-28, 6:1-8.

G.  The court did not order Dr. Basi to provide such declaration, but requested it, believing that if such disability exists then Dr. Basi would act in the best interests of Debtor-Sinclair, her purported patient, based on such disability.

No declaration was ever provided to the court by Dr. Basi or any other person testifying to the disability asserted by Debtor-Sinclair.  On October 20, 2015, Debtor-Sinclair provided his declaration asserting further disability and another hearsay document purportedly from Dr. Basi. Dckt. 281 ("2015-10-20 Debtor Status Report").  In the declaration and status report, Debtor-Sinclair recounts his sister's granddaughter having a concussion and copies of pages of magazine articles about concussions.  Though professing a "disability," Debtor-Sinclair continued in attacking Katakis et al.

Even without any medical testimony, the court continued the hearing on determining whether Debtor-Sinclair suffered from a "disability."  October 22, 2015 Civil Minutes, Dckt. 282.

The court then issued an order for Determination of Legal Competency of Debtor-Sinclair ("Competency Hrg. Ord.").  Dckt. 307.  The history of the "disability" and discovery fight between Debtor-Sinclair and Katakis et al. are reviewed in the Competency Hrg. Ord.  In expressing its

concern over Debtor-Sinclair's conduct, the court stated:

> Presumably, a doctor who has previously been expressing her medical opinion that Richard Sinclair could not attend "work/school" or "work" for specified time periods had conducted reasonable and necessary medical tests to render such opinions. The court is concerned that these summary form letters provided on the doctor's letterhead merely work to postpone the prosecution of this case, consistent with a time line that Richard Sinclair and Dr. Machado originally argued for when Richard Sinclair was representing Dr. Machado and the various entities.
>
> This perception of a delay strategy is heightened by Dr. Machado failing for two months to obtain counsel for the various entities she purports to be the trustee, member, or officer. . . .

Competency Hrg. Ord., p. 12:25–28, 13:1–10.

After allowing Debtor-Sinclair months to provide evidence from his doctors of any medical impairment, this court concluded the hearings on a determination of Debtor-Sinclair's mental competency on December 17, 2015. Civil Minutes, Dckt. 337. As stated in the court's ruling, throughout this bankruptcy case Dr. Machado, Debtor-Sinclair's sister, has been extensively involved in this case. Dr. Machado is the trustee of the Richard Sinclair Trust and managing member of the limited liability companies into which assets were transferred by Debtor-Sinclair. It is those transfers that Dr. Machado and Debtor-Sinclair assert in this case are unassailable. Until he was disbarred by the California State Bar, Debtor-Sinclair served as the attorney for Dr. Machado individually, as trustee of the Richard Sinclair Trust, and as the managing member of the limited liability company transferees.

As the court concludes in ruling on the issue of Debtor-Sinclair's "disability," it is significant that Dr. Machado and the various other family members (who are represented to be the beneficiaries of Debtor-Sinclair's transfers) never thought he suffered such a significant impairment that the appointment of a state court conservator or a personal representative in this case was warranted.

> Dr. Machado is a well-educated and intelligent woman. She has appeared before the court numerous times throughout the case and has shown not only a knowledge of the various assets of the case but also a legitimate concern over her brother and the various assets. All the while the Debtor-in-Possession [Debtor-Sinclair] has been asserting his disability and incompetency, Dr. Machado has not attempted to be appointed as the Debtor-in-Possession's personal representative in either the instant case or in state court. **If the disability is as perverse as the Debtor-in-Possession has repeatedly represented to the court,** though unauthenticated in doctor reports, **Dr. Machado would most have certainly attempted to protect her brother's interest and her own in not only the Trust but also the Sinclair Ranch**. The **failure of Dr. Machado** to seek personal representation for the Debtor-in-Possession during his alleged incompetency further **evidences that the Debtor-in-Possession**

1      **is not in fact disabled or incompetent**.

2  Civil Minutes, p. 13; Dckt. 337 (emphasis added).

3      With respect to Debtor-Sinclair asserting that he suffered from an impairment which

4  precluded his ability to participate in these proceedings and the court ordered discovery, this court

5  stated, "Though professing an inability to participate, Mr. Sinclair continues to file extensive

6  documents. He continues to argue and reargue issues." *Id.* at 14. The court's ruling refers back to

7  the discussion of the district court judge in Dist. Ct. Case 03-54389 (discussed *supra*) concerning

8  Debtor-Sinclair professing to have a medical "disability," but being able to actively pursue litigation

9  he thought was to his advantage.

10      In concluding that Debtor-Sinclair did not have evidence of any actual "disability," the court

11  stated:

12          Though months have passed for Mr. Sinclair's doctors to provide credible,
        competent medical opinions as to Mr. Sinclair's legal competency, no such credible
13      testimony has been provided. The court has served the orders requiring such
        testimony on the doctors themselves so that they personally would know what was
14      at stake, not merely reply on Mr. Sinclair to communicate with them. The response
        from the doctors has been lacking.

15
        The original excuse from a doctor was the "excuse from school or work"
16      form note from Doctor Upinder K. Basi. Exhibit A, Dckt. 244. In this form note,
        Dr. Basi stated her medical opinion that Mr. Sinclair may return to "school or work"
17      on October 1, 2015. Dr. Basi did not even complete the part of the note to designate
        whether the return to "school or work" was "with/without restrictions."
18

19          Though professing incapacity, Mr. Sinclair filed a responsive pleading in
        which he addressed facts and allegations (favorable to his position) to oppose his
20      creditor opponents. Response, Dckt. 222, filed August 3, 2015. He then filed another
        pleading on August 25, 2015, asserting an inability to comply with court orders.
21      Declaration and Memorandum of Points and Authorities, Dckt. 232. On September 8,
        2015, Mr. Sinclair filed a Declaration, Request for Delay, Memorandum of Points
22      and Authorities, asserting his position why the case should not proceed due to his
        incapacity. Dckt. 244.
23

24  Civil Minutes, p. 15; Dckt. 15. In the Civil Minutes, the court recounts the continued filings by

25  Debtor-Sinclair and the "excuse notes" purportedly from Dr. Basi. Further, Debtor-Sinclair was able

26  to recall alleged facts and find documents which he could present to advance his case, while

27  professing a "disability" to fulfill his discovery obligations.

28      The conclusions of the court in determining that Debtor-Sinclair did not suffer from a

"disability" and that he should not be allowed to further delay these proceedings, include:

> It has been demonstrated that **Mr. Sinclair does not suffer from a disability or capacity impairment**. Rather, as in his other cases, **while professing an impairment he is litigating the case.** The court notes that just prior to the "impairment," Mr. Sinclair was advocating that discovery be put on hold until the end of the summer. Due to the "impairment," such discovery has effectively been put on hold until December 2015.

> **During this time he has litigated the case with his sister, Dr. Machado**. The court has to believe that if the impairment existed, Dr. Machado would have acted to insure that her brother received the necessary medical and legal assistance. Instead, Dr. Machado (who is the principal of entities which received what may be fraudulent conveyances) has benefitted from the "impairment delay," without taking any overt action to assist her brother.

Civil Minutes, p. 16; Dckt. 337 (emphasis added).

Though afforded multiple opportunities, and having the court's order sent directly to the doctor who was purporting to care for Debtor-Sinclair and state that Debtor-Sinclair suffered from a "disability," no credible evidence was presented to the court. It has never been shown by credible evidence that Debtor-Sinclair has suffered from any "disability" during this Chapter 7 case. What has been shown is that the asserted "disability" worked to Debtor-Sinclair's and Dr. Machado's advantage in delaying discovery previously ordered by the court in this bankruptcy case when Debtor-Sinclair was unable to get an order from the court delaying such discovery.

### DEBTOR-SINCLAIR'S REPRESENTATION AS AN ATTORNEY OF CONFLICTING INTERESTS IN THIS BANKRUPTCY CASE

While serving as the debtor in possession (the fiduciary of the bankruptcy estate in lieu of a bankruptcy trustee being appointed, 11 U.S.C. § 1107) and representing himself (in lieu of hiring a third-party attorney) during the Chapter 11 period of this case, Debtor-Sinclair also served as the attorney for his sister, Dr. Machado, the trustee of the Richard Sinclair Trust and the managing member of the limited liability companies that received the various transfers during the applicable fraudulent conveyance periods (which extend back in time to ten years, 11 U.S.C. § 548(e)(1), for the trust). Debtor-Sinclair, as the debtor in possession and counsel for the debtor in possession, had the fiduciary duty to properly investigate the transfers, assert claims to avoid transfers, and recover transfers for the benefit of the estate and creditors.

But Debtor-Sinclair also represented Dr. Machado to advise her how to defeat any possible

rights and interests of the estate to avoid fraudulent conveyances.  Though the court raised this issue several times to both Debtor-Sinclair and Dr. Machado, neither appeared to have any concern that Debtor-Sinclair was professionally taking on the job of representing Dr. Machado to oppose Debtor-Sinclair as the debtor in possession and as the attorney for the debtor in possession.  Dr. Machado continued to use Debtor-Sinclair to represent her against Debtor-Sinclair as the debtor in possession and Debtor-Sinclair as the attorney for the debtor in possession.  This conflict in representing adverse interests continued until Debtor-Sinclair was suspended from the practice of law by the California State Bar and ultimately disbarred by the California Supreme Court.

Because of the palpable animosity and bad blood litigation between Debtor-Sinclair and Katakis et al., the court did not *sua sponte* press this issue.[5]  Sufficient time existed for the appointment of a bankruptcy trustee to review the transfers and exercise the estate's rights, as well as possible claims arising from the use of Debtor-Sinclair as the attorney for Dr. Machado.  Additionally, the main fight in the bankruptcy case appeared to be with Katakis et al., who were represented by knowledgeable counsel to protect the Katakis et al. interests in the short-run, and indirectly protect the interests of other creditors and the bankruptcy estate during that period.

In the summer of 2015, Debtor-Sinclair was suspended from the practice of law.  The court issued an Order for Dr. Machado, in her capacity as the trustee of the Richard Sinclair Trust and managing member of the limited liability companies, to appear with new counsel in this bankruptcy case.  Order, Dckt. 235.  The court clearly explained that if Dr. Machado, consistent with her fiduciary duties as a trustee and managing member, wanted to assert and protect the rights and interests of the Richard Sinclair Trust and limited liability companies in this bankruptcy case, she had to be represented by a licensed attorney permitted to practice law in California.  Dr. Machado and her new counsel were ordered to appear on October 1, 2015, giving Dr. Machado a full month to interview and engage a licensed attorney to represent her.

On October 1, 2015, the court conducted a status conference in the Chapter 11 case.  *See* Civil Minutes for October 1, 2015 Status Conference, Dckt. 258.  When the court questioned how

---

[5]  The court notes that the issue was not pressed by any other party in interest, including the U.S. Trustee.  The court views this as a sign of the parties in interest reaching the same conclusion as the court at that early stage of the case.

Dr. Machado, in good faith, had not yet retained a licensed attorney to represent her, she told the court she had, but for some "unknown reason" the attorney was not at the hearing.  As detailed by the court in the Civil Minutes, such statement was quickly admitted by Dr. Machado to be a false statement by her.  The court's findings and conclusions on this point are:

> The court also addressed with Dr. Machado the failure to substitute in as counsel for Dr. Machado and the entities for which she is the managing member, trustee, or representative. **At the hearing Dr. Machado represented, several times, that she had retained as counsel for herself and the entities Ian Macdonald.** Additionally, that she did not know why he was not at the hearing, since he had been so employed. The court requested that the court's staff call Mr. Macdonald's office during the hearing to determine if he was on his way to court or was unaware of the hearing. The staff reported that he was not at the office.

> The court then stated that it would issue an order for Mr. Macdonald to appear the next week in the Sacramento courtroom to address Dr. Machado's representations that Mr. Macdonald was the attorney for the doctor and the entities. Dr. Machado stated that she was available to appear. Then the court noted that if it was an inaccurate statement that Mr. Macdonald had been engaged as counsel and the court wasted Mr. Macdonald's time by bringing him to Sacramento based on Dr. Machado's representations, then the court would sanction Dr. Machado and the entities for the loss of Mr. Macdonald's time. Estimating Mr. Macdonald to have at least a $400 an hour billing rate and the hearing exhausting at least six hours of time, the sanctions could be between $2,500 and $3,000.

> At that point Dr. Machado stated that while she had signed the engagement letter, she had not sent Mr. Macdonald the $10,000 retainer which was required as a condition of employment. Rather, Dr. Machado stated that she proposed that Mr. Macdonald commence the representation and that a retainer would be funded out of some future escrow. **[Dr. Machado] then conceded that Mr. Macdonald had not yet been employed as counsel.**

> Dr. Machado then represented to the court that she would engage counsel, even if it was less expensive counsel. The court noted to Dr. Machado that Mr. Sinclair has a very distinctive writing and advocacy style. If the court were to see a newer attorney signing pleadings, but they were written in the same style and legal content as Mr. Sinclair's pleadings, then the court would be concerned that the new attorney was merely lending his or her bar license to Mr. Sinclair to engage in the unlicensed practice of law. **The court expressed concern that it could appear from the file that Dr. Machado was already promoting the unlicensed practice of law by having Mr. Sinclair draft pleadings for and provide legal [advice] to Dr. Machado and the entities, which Dr. Machado would then sign purportedly in *pro se*.**

Civil Minutes, p. 18–19; Dckt. 258 (emphasis added).

The court then continued the hearing for Dr. Machado and her counsel to appear to October 8, 2015, for the Order to Appear.  Civil Minutes, Dckt. 263.  In the Civil Minutes for the October 8, 2015 hearing, the court recounts having addressed on May 19, 2015 (citing to the Civil

1    Minutes from that hearing, Dckt. 200),  the conflict of interest in having Debtor-Sinclair serve as

2    the debtor in possession, attorney for debtor in possession, and attorney for Dr. Machado and the

3    transferee entities against Richard Sinclair as the debtor in possession.  The Civil Minutes also

4    reflect that the courtroom deputy printed off and provided Dr. Machado with a copy of Judge Ishii's

5    decision in Dist. Ct. Case 03-5439 (discussed above and in Appendix B).

6         At the October 22, 2015 further continued hearing on the Order to Appear, Jessica Dorn, Esq.

7    appeared as counsel for Dr. Machado personally, but not for her as trustee of the Richard Sinclair

8    Trust or for any of the entities receiving transfers from Debtor-Sinclair for which she is the

9    managing member.  Civil Minutes, p. 6; Dckt. 289.  As discussed in the Civil Minutes, though

10   disbarred, Debtor-Sinclair attempted to represent Dr. Machado as trustee and managing member.

11        No explanation was provided as to why, if these were *bona fide* trusts and
          other entities, to which Dr. Machado owes a fiduciary duty, counsel had not been
12        retained. Dr. Machado was provided more [than] fifty-two days after the disbarment
          of Mr. Sinclair to obtain such counsel.  As the court noted at the Status Conference,
13        Dr. Machado had previously provided documents for herself and the entities which
          indicate that each have resources to engage counsel to in good faith act to protect
14        their respective bona fide rights and interests.

15        Several time during the hearing Mr. Sinclair, former counsel for Dr. Machado
          and the entities in this bankruptcy case prior to his being disbarred, tried to speak for
16        Dr. Machado and the entities. The court did not allow Mr. Sinclair to engage in the
          unlicensed practice of law.
17   . . .
          To the extent that Dr. Machado has chosen to not engage counsel to represent
18        the various entities, she has done so with full knowledge of such requirement and the
          risks inherent for unrepresented parties at depositions and bankruptcy proceedings.
19

20   *Id.*  It appeared that Dr. Machado was attempting to have Debtor-Sinclair engage in the unlicensed

21   practice of law, ignoring California law and her duties as trustee and managing member of the

22   limited liability companies to have them properly represented in federal judicial proceedings.

23        On December 15, 2015,  substitutions of attorney were filed, with Holly R. Coates, Esq., of

24   Borton Petrini, LLP (the same firm in which Jessica Dorn, Esq. is an attorney), substituted in as the

25   attorney for two of the limited liability companies.  Dckts. 325, 327.  The court cannot find a

26   substitution of attorney for anyone to represent Dr. Machado as the trustee of the Richard Sinclair

27   Trust which received transfers from Debtor-Sinclair during the fraudulent conveyance period.

28        Since obtaining such new counsel, Dr. Machado has disappeared from these proceedings,

appearing only at the December 15, 2016 hearing with her counsel because she was so ordered by the court. At the hearing, her attorney commented that Dr. Machado just sought to be done with these bankruptcy court proceedings.

## VARYING VALUATIONS OF CLAIMS AT ISSUE
## BY DEBTOR-SINCLAIR

Throughout this bankruptcy case, Debtor-Sinclair has stated that the claims that are the subject of the present Motion have had varying values, with those values appearing to crescendo with the Opposition now before the court.

When he filed this bankruptcy case, Debtor-Sinclair stated under penalty of perjury that the estate had the following claims against others:

> "Katakis case for malicious prosecution plus Truax case" with a value of "approx $6 million."

Schedule B, Dckt. 42, p. 3. The portion of the $6 Million for the "Katakis case" was not allocated by Debtor-Sinclair.

In Debtor-Sinclair's motion seeking to induce the court to improperly purport to vacate a state court judgment and his opposition to a motion by Katakis et al. to have the bankruptcy case converted, Debtor-Sinclair's statement of value of the claims grew to $25 Million. Opposition, p.9: 20.5–21.5; Dckt. 87. Debtor-Sinclair repeats this increased $25 Million value in his March 3, 2015 reply to the Katakis et al. opposition to Debtor-Sinclair's motion to have his bankruptcy case dismissed, stating:

> Sinclair also has a $25 million suit filed against Katakis and soon will be filing a new suit for $25 million for the Fraud on the Court pursuant to Rule 60 (d) and CC 3294 in both State and Federal Court and will seek injunctions to stop Katakis stalking of Sinclair since 1995. 20 years is long enough.

Reply, p. 6:18.5–21.5; Dckt. 125. The amended judgment Debtor-Sinclair seeks to avoid based on the alleged "fraud" was issued on June 18, 2010. Adv. Pro. 15-9007; Exhibit 4 to Complaint, Dckt. 9. This judgment was affirmed on appeal, with that appellate decision filed on January 23, 2013. *Id.*; Exhibit 5, Dckt. 10. If vacating the judgment for fraud is a straight-forward affair, Debtor-Sinclair offers no explanation as to why it was not accomplished in the four years and five

1   months from it being issued in June 2010 and Debtor-Sinclair commencing this bankruptcy case on

2   November 24, 2014.  Nor, why it was not addressed in the year that passed after filing bankruptcy

3   in November 2014 and prior to this bankruptcy case being converted to one under Chapter 7 on

4   December 18, 2015.

5        In his February 8, 2015, Opposition to the motion filed by Katakis et al. to convert this case

6   to one under Chapter 7, Debtor-Sinclair stated that the bankruptcy estate had "$50 million in suits

7   against Katakis and Truax."  Opposition Statement (a supplement to his opposition), p. 2, ¶ 8;

8   Dckt. 99.  Debtor-Sinclair further argued that it was likely that he would confirm a plan in his

9   Chapter 11 case.  No reason was, or has been given for the increased value for these pre-petition

10  claims that are included in the bankruptcy estate.

11       It appears that the valuations of these claims by Debtor-Sinclair are not based on rational

12  analysis, but whatever number Debtor-Sinclair believes supports whatever he is attempting to do,

13  or prevent from someone else doing, in this bankruptcy case.  In his November 16, 2016 filed Status

14  Report, Debtor-Sinclair states that he now computes the damages as his "losses" caused by Katakis

15  et al. Status Report, p. 3:3-4.  The court is not provided with any explanation as to what "losses"

16  have occurred since November 2014 that have caused the value of this asset to increase to whatever

17  portion of the $6 Million stated on Schedule B under penalty of perjury when this case was filed to

18  now $40 Million.  No explanation has been provided how "losses" could have occurred since

19  November 2014, when Debtor-Sinclair commenced this bankruptcy case and the automatic stay has

20  protected Debtor-Sinclair and the property of the bankruptcy estate.  Additionally, no declaration

21  or credible explanation is provided as to what "assets" the bankruptcy estate or Debtor-Sinclair

22  could have for such "losses" to be incurred, Debtor-Sinclair having transferred all significant assets

23  to his wife, the Sinclair Trust, and the limited liability companies prior to the commencement of this

24  case.

### STATEMENT OF APPLICABLE LAW GOVERNING
### MOTION FOR APPROVAL OF A COMPROMISE OR SETTLEMENT

27       Debtor-Sinclair has provided the court with extensive briefs on the proper standard of review

28  by a bankruptcy judge in considering whether a compromise by a bankruptcy trustee, as the

fiduciary of the bankruptcy estate, should be approved after hearing as provided in Federal Rule of Bankruptcy Procedure 9019. In substance, it appears that Debtor-Sinclair's contention is that the bankruptcy judge must effectively conduct a mini-trial on the underlying claims before approving any compromise which the Bankruptcy Trustee has presented in the exercise of his business judgment.

Starting with the basics, the Supreme Court has enacted Federal Rule of Bankruptcy Procedure 9019 which provides that upon motion of a bankruptcy trustee a court may approve a compromise or settlement. Rule 9019 does not grant a right to compromise, but merely provides a procedure for a bankruptcy trustee (debtor in possession or other person allowed to exercise powers of a bankruptcy trustee) to obtain a court order approving the compromise.

The ability of a bankruptcy trustee to enter into a comprise has its roots in 11 U.S.C. § 704 which requires (using the word "shall" in the statute) the Chapter 7 bankruptcy trustee to collect and reduce to money property of the estate. Property of the estate includes claims or rights of the debtor which exist as of the commencement of the bankruptcy case 11 U.S.C. § 541(a)(1), and other post-bankruptcy rights specified in 11 U.S.C. § 541 and property which may be recovered by a bankruptcy trustee (11 U.S.C. § 544 *et seq.*).

As noted in COLLIER ON BANKRUPTCY, SIXTEENTH EDITION, ¶ 9019.02, the various Circuit Courts of Appeals have taken the "cue" in setting the standards for approval of compromises from the Supreme Court in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968). The compromise at issue in *TMT Trailer Ferry, Inc.* did not arise under the Bankruptcy Code or in a Chapter 7 case, but in a Bankruptcy Act Chapter X reorganization plan as part of the plan confirmation. Some of the pertinent statements of the Supreme Court in *TMT Trailer Ferry, Inc.* include the following:

A.    "The fact that courts do not ordinarily scrutinize the merits of compromises involved in suits between individual litigants cannot affect the duty of a bankruptcy court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable. *In re Chicago Rapid Transit Co.*, 196 F.2d 484 (C. A. 7th Cir. 1952)." *Id.*, 424.

B.    "There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary  for an intelligent and objective opinion of the probabilities of

26

ultimate success should the claim be litigated." *Id.*

C.  "Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. " *Id.*

D.  "The record before us leaves us completely uninformed as to whether the trial court ever evaluated the merits of the causes of actions held by the debtor, the prospects and problems of litigating those claims, or the fairness of the terms of compromise. More than this, the record is devoid of facts which would have permitted a reasoned judgment that the claims of actions should be settled in this fashion." *Id.,* 440–41.

While not providing specific criteria for addressing a compromise which was part of a reorganization plan under the former Bankruptcy Act, the Supreme Court is clear that the trial judge is not merely the rubber stamp for the advocate of the stipulation plan term.  Nor is a bankruptcy judge the rubber stamp for the opponent of the stipulation plan term.

In discussing the application of the "informed and independent judgment" of the bankruptcy judge in approving or not approving a settlement, COLLIER continues:

> The TMT rule does not require the bankruptcy judge to hold a full evidentiary hearing [6] or even a "mini-trial" [7] before a compromise can be approved. Otherwise, there would be no point in compromising; the parties might as well go ahead and try the case. Instead, the obligation of the court is to "canvass the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'" [8]

> Footnote 6.    *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 31 C.B.C.2d 1525 (7th Cir. 1994).

> Footnote 7.    *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586, 31 C.B.C.2d 1525 (7th Cir. 1994); *Port O'Call Inv. Co. v. Blair (In re Blair)*, 538 F.2d 849 (9th Cir. 1976); *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493 (Bankr. S.D.N.Y. 1991).  Similarly, it was not an abuse of discretion when a bankruptcy court cancelled a scheduled hearing on a motion to approve a compromise when all the parties, including the objector, agreed that the matter could be decided on their written submissions. *Tri-State Financial, LLC v. Lovald*, 525 F.3d 649, 655 (8th Cir.), *cert. denied*, 555 U.S. 1046, 129 S. Ct. 630, 172 L. Ed. 2d 610 (2008).

> Footnote 8.    *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493 (Bankr. S.D.N.Y. 1991) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir.), *cert. denied sub nom.* 464 U.S. 822, 104 S. Ct. 89, 78 L. Ed. 2d 97 (1983)); *In re Doctors Hospital of Hyde Park, Inc.*, 474 F.3d 421, 428-30 (7th Cir. 2007).

COLLIER ON BANKRUPTCY, SIXTEENTH EDITION, ¶ 9019.02.

As stated by the Ninth Circuit Court of Appeals in affirming the determination of the

bankruptcy judge in approving the settlement in a bankruptcy liquidation, as opposed to a Chapter X

reorganization as addressed by the Supreme Court in *TMT Trailer Ferry, Inc.*:

> When considering whether to approve a compromise in liquidation bankruptcy proceedings, the trustee and bankruptcy judge should weigh the probable costs and benefits. They should consider factors such as the complexity and hazards of litigation, the expense (attorney's fees and the costs of court and discovery), the time required, and whether disapproval of the compromise would likely result in the wasting of assets.
>
> Considering the lengthy delay occasioned by this appeal and the additional attorneys' fees and appellate costs, this appeal may be an example of asset wasting. The bankruptcy judge and the district court may, in a case such as this, give weight to the opinions of the trustee, the parties, and their attorneys. The judge and court may consider the principals' belief that the factors outlined above (and others) have been explored and considered and that the compromise is fair, reasonable, and the wisest course. Consideration should also be given to the principle that the law favors compromise and not litigation for its own sake.
>
> Appellant asserts that even in a liquidation bankruptcy compromise proceeding, there must be a mini-trial on the merits of claims sought to be compromised. We reject the notion. The decision as to whether there should be a mini-trial in a liquidation bankruptcy as to the merits of the compromised claims and defenses is best left to the sound discretion of the bankruptcy judge upon an application and showing of necessity by the interested parties or by creditors of the bankrupt.
>
> This is not the same as a Chapter X proceeding and there are sound reasons for drawing the distinction. A corporate reorganization is a continuing business affair requiring close supervision and affecting many interested parties. The success or failure of a reorganization may hinge upon the very compromise at issue. [2] A liquidation bankruptcy is a terminal affair. The bankrupt's financial affairs are beyond repair. Liquidation is to be accomplished as rapidly as possible consistent with obtaining the best possible realization upon the available assets and without undue waste by needless or fruitless litigation.
>
> 2.   *In Protective Committee for Independent Stockholders, etc. v. Anderson*, *supra*, 390 U.S. at 423, the lower court judgment "was rendered without considering the future estimated earnings of the reorganized company." Such a vital issue is not involved in a liquidation bankruptcy compromise.

*Port O'Call Inv. Co. v. Blair (In re Blair)*, 538 F.2d 849, 851–52  (9th Cir. 1976).

More recently, the Ninth Circuit Court of Appeals addressed the proper consideration of a

proposed compromise as follows:

> The bankruptcy court has great latitude in approving compromise agreements. *See Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1380-81 (9th Cir.), *cert. denied sub nom. Martin v. Robinson*, 479 U.S. 854, 107 S. Ct. 189, 93 L. Ed. 2d 122 (1986). However, the court's discretion is not unlimited. The court may approve a

compromise only if it is "fair and equitable." *Id.* at 1381; see 11 U.S.C. § 1129(b)(1) (1982) (reorganization plans must be "fair and equitable" as to nonconsenting class); *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 20 L. Ed. 2d 1, 88 S. Ct. 1157 (1968) (applying standard of section 1129's precursor to compromises). Moreover, in passing on the proposed compromise, the court must consider:

> "(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises [asset at issue]."
> *A & C Properties*, 784 F.2d at 1381 (citation omitted); *see Anderson*, 390 U.S. at 424.

*Woodson v. Fireman's Fund Insurance Company (In re Woodson)*; 839 F.2d 610, 620 (9th Cir. 1987).

The Bankruptcy Trustee argues that the four factors have been met. Under the settlement, the Bankruptcy Trustee shall recover $40,000.00 from Katakis et al. in satisfaction of the Estate's claim for recovery of the property, with an originally asserted value of part of the $6,000,000.00 stated on Schedule B by Debtor-Sinclair. The Bankruptcy Trustee asserts that through the Settlement this property can be recovered on the claims against Katakis et al. for the bankruptcy estate. This proposed settlement allows the Bankruptcy Trustee to recover for the Estate $40,000.00 without further cost or expense and is 0.67% of the maximum amount of the claim identified by the Bankruptcy Trustee.

Under the terms of the settlement, all claims of the Estate, including any pre-petition claims of Debtor-Sinclair, are fully and completely settled, with all such claims released. Katakis et al. have granted a corresponding release for Debtor-Sinclair and the Estate.

## DETERMINATION OF FACTORS FOR THE SETTLEMENT PRESENTED TO THE COURT

The court begins with the four basic factors long established for a bankruptcy judge to consider a settlement presented by a bankruptcy trustee.

**Probability of Success**

The Bankruptcy Trustee notes that Debtor-Sinclair and Katakis et al. have been litigating for

more than ten years, with the disputes continuing since the commencement of this bankruptcy case. Debtor-Sinclair's claims appear to be an attempt to recast many of the same business and litigation disputes between Debtor-Sinclair and Katakis et al. as being in the nature of personal injury or tort claims. There is a legitimate dispute as to whether any of Debtor-Sinclair's claims against Katakis et al. have any value, and the Bankruptcy Trustee notes that Debtor-Sinclair has been substantially unsuccessful in litigating various claims for many years.

The core of this dispute has been going on for almost two decades, during which Debtor-Sinclair has not only been the loser, but has been sanctioned by other courts. While Debtor-Sinclair argues that the portion of the $6 Million asset on Schedule B has now grown to $40 Million, he has provided the court with no cogent argument and no evidence to support such a contention.

More significantly, Debtor-Sinclair has not presented the court with any credible argument or evidence that the claims to be settled can be successfully litigated. To the contrary, Debtor-Sinclair's past conduct has demonstrated that they cannot be successfully litigated. Further, that to try and successfully litigate these claims the Bankruptcy Trustee would have to have judgments against Debtor-Sinclair vacated—something that Debtor-Sinclair has failed to do for now more than six years. (The amended judgment in the 2003 State Court Action judgment was issued in June 2010, and Debtor-Sinclair then prosecuted, and lost, an appeal on the merits thereafter.)

As demonstrated by Debtor-Sinclair prior to this case and during his tenure as the debtor in possession during the eight months before the July 2015 "accident" from which Debtor-Sinclair asserted a disability, this is not a claim that shows a probability of success. Rather, the value to Debtor-Sinclair is that of a "spite litigation asset," to be utilized in the Debtor-Sinclair/Katakis et al. litigation death spiral.

If these claims could have been successfully prosecuted, Debtor-Sinclair, when he was a licensed attorney, would have actively and successfully litigated such claims. At the hearing, the court directly asked Debtor-Sinclair why he did not bring a motion to vacate a judgment for "fraud" in 2009 when the original judgment in the 2003 State Court Action was entered, in 2010 when the amended judgment was entered in the 2003 State Court Action, or thereafter in 2010, 2011, 2012, 2013, 2014, or 2015, if there is such an easy winning argument to set aside the 2003 State Court

Action judgment and there was a multi-million (or multi-tens of millions) claim which he now asserts could be prosecuted for the bankruptcy estate. All Debtor-Sinclair could state was that "he was disabled." But this is not credible in that Debtor-Sinclair actively litigated other matters in other courts. Even more significantly, Debtor-Sinclair was able to prosecute the appeal of the 2003 State Court Action judgment, both in briefing and oral argument. Debtor-Sinclair clearly was not disabled such that he was prevented from bringing any motion to vacate the judgment in the 2003 State Court Action until now, with it to be done in 2017. The court concludes that this contention of "disability" is one borne out of improper litigation strategy, Debtor-Sinclair having lost on the merits and seeking to assert it as yet another maneuver to prevent the state court and district court from concluding his decades long litigation.

Additionally, Debtor-Sinclair argues against approving the settlement because he wants to try and prosecute a fourth amended complaint. Given Debtor-Sinclair's self-admitted higher legal education and experience, in addition to his business experience, if there was a reasonable probability of success he would have been prosecuting a complaint or first amended complaint years ago. That he is having to try to find a way to state some possible claim through a fourth amended complaint indicates that no such easily stated, clearly meritorious claim exists. This even further diminishes the probability of success.

**Difficulties in Collection**

The Bankruptcy Trustee believes that this factor weighs strongly in favor of settlement because there is reason to believe that Katakis et al. would continue to litigate with the Bankruptcy Trustee and the Estate after any judgment, which would increase administrative expenses greatly and implicate the ability to collect proceeds for the benefit of the Estate.

Again, even if judgment were to be obtained, Katakis et al. have demonstrated that they believe in litigation at all cost, not merely attempting to enforce or defend rights. They have been the litigation "Yin" to Debtor-Sinclair's litigation "Yang."

More significantly, Debtor-Sinclair advises this court that Mr. Katakis is subject to prosecution for "criminal stalking," "criminal foreclosure," and "assault" Opposition, p. 3, 9; Dckt. 487. In a recent Status Conference Statement, Debtor-Sinclair also advised the court that

31

Mr. Katakis is subject to prosecution for "criminal extortion," "criminal foreclosure fraud," "'assault' and "criminal extortion" dating back to 2003, Status Report, 2, 4, 6 Dckt. 488. He also advised the court that Mr. Katakis has been convicted of criminal foreclosure fraud. *Id.*, p. 2.

Such a described "criminally responsible" person further heightens the difficulties in collection, both as to the assets which get diverted to such defense, as well as the inability for someone to generate income given Debtor-Sinclair's conviction that Mr. Katakis will be convicted.

**Expense, Inconvenience, and Delay of Continued Litigation**

The Bankruptcy Trustee asserts that the Estate's interest in claims in this Settlement has been made complex by the conduct of the parties. Debtor-Sinclair having litigated for more than a decade, there is every reason to believe that further litigation will be hotly contested, and the parties will face years (or further decades) of delay, and will incur more administrative expenses for the Estate. Settlement avoids those risks and mounting expenses.

Debtor-Sinclair also demonstrates that the time and expense of litigating these claims would be hugely expensive. Debtor-Sinclair, notwithstanding his substantial legal education and expertise and more than a decade of litigating with Katakis et al., has been unable to produce a judgment against Katakis et al. Debtor-Sinclair failed to even file a motion to vacate the judgment in the 2003 State Court Action for six years after the judgment was entered in 2009, all the time he was in sole control of any such motion (the period prior to the December 2015 appointment of the Bankruptcy Trustee in this case). At best, Debtor-Sinclair is now having to try to propose a fourth amended cross-complaint. The prosecution of this fourth amended complaint depends on Debtor-Sinclair being able to vacate the judgment issued in 2010 in the 2003 State Court Action, which has been affirmed on appeal. This indicates that at best the possible claims are of such a nature that more years, if not decades, of litigation cost and expense would be required.

**Paramount Interest of Creditors**

The Bankruptcy Trustee argues that settlement is in the paramount interests of creditors because the compromise provides resolution of the disputes in an overall cost-effective manner while obtaining a meaningful recovery for the Estate and creditors.

Debtor-Sinclair argues that it is the better interest of creditors if he is allowed to continue

in the decades of this litigation and can to recover tens of millions of dollars. But what Debtor-Sinclair has not shown is an intention to pay his creditors. In reviewing the proofs of claim, the court notes that one is filed by Deborah Sinclair, Debtor-Sinclair's wife. In Proof of Claim No. 8, Mrs. Sinclair states under penalty of perjury that Debtor-Sinclair owes her, as of the November 24, 2014 filing of this bankruptcy case, $152,988.33. Of this, $128,882.50 is asserted to be a priority claim as a domestic support obligation. In the attachment to Proof of Claim No. 8, Mrs. Sinclair asserts that no payments have been made to her beginning September 1, 2011 and continuing March 1, 2015 (Proof of Claim No. 8 being filed on March 15, 2015). No copies of any documents supporting this claim are attached to Proof of Claim No. 8.

The court also considers that the Bankruptcy Trustee has procured the general release for the Bankruptcy Trustee, estate, and successors, and the withdrawal of all claims in this case by Katakis et al. Whether such releases and withdrawal of claims will be of value to creditors turns on how much, if any, the Bankruptcy Trustee can recover as part of this liquidation.

The interests of creditors, as stated at the December 15, 2016 hearing and in other proceedings are to get the endless litigation done and bring at least some of these matters to a conclusion. To the extent that a creditor may have an asserted nondischargeable claim, that creditor can have that bankruptcy law issued determined and closed – whether the creditor or Debtor-Sinclair wins. Debtor-Sinclair demonstrates, and has demonstrated in this case, that his intention is to continue to have his creditors sucked into the Sinclair/Katakis et al. LitigationVortex.

This settlement is in the paramount interest of creditors.

## FAILURE OF MRS. SINCLAIR; DR. MACHADO, TRUSTEE OF THE RICHARD SINCLAIR TRUST AND MANAGING MEMBER OF LIMITED LIABILITY COMPANIES; AND SINCLAIR CHILDREN TO TENDER $40,000.00 TO THE BANKRUPTCY TRUSTEE

Debtor-Sinclair has presented the court with an interesting issue to address when considering the proposed settlement. It appears that Katakis et al. have an equal desire to continue in litigation with Debtor-Sinclair to the financial death of either or both. In part this is demonstrated by Katakis et al. generating only a modest dollar settlement amount with the Bankruptcy Trustee, leaving it

open to this attack by Debtor-Sinclair.[6]  If Katakis et al. had any desire to bring the death spiral

litigation to an end, there are many things they could have done in cooperation with the Bankruptcy

Trustee.[7]  They offer nothing more than $40,000.00 so that they can get rid of Debtor-Sinclair's

attempts to unsuccessfully assert counter-claims.

Correspondingly, after the appointment of the Bankruptcy Trustee, Dr. Machado, as trustee

of the Richard Sinclair Trust and managing member of the limited liability companies, Mrs. Sinclair,

and the Sinclair Children, all as transferees of Debtor-Sinclair and some as creditors, had the

opportunity to join forces with the Bankruptcy Trustee to assert the claims against Katakis et al. and

reap substantial rewards.  They could have acquired an interest in what Debtor-Sinclair now

computes as a $40 Million claim, as well as generating a substantial surplus estate for Debtor-

Sinclair—if they believed these claims actually have any significant value.

Just as Katakis et al. failed to ally with the Bankruptcy Trustee; Dr. Machado, Mrs. Sinclair,

and the Sinclair Children failed to joint forces with the independent Bankruptcy Trustee in this

Chapter 7 case who was unencumbered by Debtor-Sinclair's conduct (and misconduct) in not

---

[6]  In looking at what the years of litigation have left Debtor-Sinclair financially, one has to wonder why Katakis et al. would expend further time, money, and energy in trying to pile on judgments against Debtor-Sinclair, except for the "sport of it."  Nobody, including the Bankruptcy Trustee has directed the court to any significant assets that Debtor-Sinclair has or what can be recovered from any avoided transfers, even with a bankruptcy trustee's "super-creditor avoiding powers."  With a more than $1,000,000.00 judgment in hand, Katakis et al. desire to continue piling up what appear to be uncollectable judgments.  This further adds to the court's perception that these parties are more concerned with being in a litigation death spiral rather than making rational economic litigation decisions.

At the hearing, counsel for Katakis et al. offered the rationale that since Debtor-Sinclair had demonstrated the willingness to engaged in protracted, not in good faith, litigation, Katakis et al. believed that getting a judgment, even if not collectable in the District Court was added protection from Debtor-Sinclair.  As stated by the court, this appears to be a "mutually assured destruction" argument from the 1960's cold-war era, with this litigation being part of the nuclear tipped arsenal so that Debtor-Sinclair could be destroyed multiple times over.

[7]  Examples of such include allying with a trustee to recover property for the benefit of the estate, providing resources to the estate, and developing a broader cooperative effort between many creditors and trustee in advancing the collective interests of the estate that ultimately benefits all creditors.

34

effectively asserting these possible claims of the estate and defending the claims of Katakis et al. brought against him.

///

**Consideration of Interests of Debtor-Sinclair**

Debtor-Sinclair advocates that for a mere pittance of $40,000.00, Katakis et al. will strip Debtor-Sinclair of all his valuable counter-claims which he intends to pursue in the future. This is asserted to leave Debtor-Sinclair all but naked to continue to be the subject of what Debtor-Sinclair describes as litigation abuse (though courts rule against Debtor-Sinclair on his various claims, rights, and defenses asserted). The court has not been blind to this situation and consideration of Debtor-Sinclair's interests.

Merely because Debtor-Sinclair contends these are valuable rights does not make it so. For Debtor-Sinclair, he would have the court effectively try all of these contentions in what appears to be an effort to forestall this Chapter 7 liquidation to add to the decades of his litigation with Katakis et al. That would have the effect of rendering the efforts of the Bankruptcy Trustee to settle claims moot and have the court issue an advisory opinion. While Debtor-Sinclair appears to desire an advisory opinion, which he could then use to tell the state court that its existing judgment is wrong, and further delay this bankruptcy case, the court will not do so.

Further, according to Debtor-Sinclair he does not have assets (stating he is "out of money") to pursue such litigation. *See* Debtor-Sinclair's proposed 52-page Fourth Amended Complaint, ¶ 18.9, he seeks to file in Superior Court case no. 668157, Stanislaus County, (Dckt. 469). In addition to stating that he does not have assets that could be used to prosecute such litigation, Debtor-Sinclair also demonstrates that the nondischargeable judgments retained (if any) by Katakis et al. may be of little economic value. At the hearing for the Motion, the court noted that Debtor-Sinclair appears (based on the financial information provided under penalty of perjury in the Schedules) to have become a "financial turnip," rendering any monetary judgment held by Katakis

et al. unenforceable.[8]

While Debtor-Sinclair may believe that the "spite litigation" value of the claims being settled is worth more than $40,000.00 to him, his allies do not concur. Mrs. Sinclair, Dr. Machado (as trustee of the Sinclair Trust and managing member of the limited liability companies) and the Sinclair Children have all received transfers of substantial assets or the beneficiaries of such assets from Debtor-Sinclair. If the claims being settled are worth $40 Million (or any significant amount in excess of $40,000.00), these transferees could, and would, readily fund the mere 1/1000 of the Debtor–Sinclair asserted value, $40,000.00, to purchase the claims from the estate and join with Debtor-Sinclair to take the fight to Katakis et al.

However, Dr. Machado, Mrs. Sinclair, and the Sinclair Children have not stepped forward to purchase these claims for what Debtor-Sinclair asserts is a fraction of their value. By failing to take advantage of this "opportunity," these Debtor-Sinclair financial allies vote with their feet, telling the court that the claims do not have significant value in excess of the $40,000.00.

Based on the actual evidence, including Debtor-Sinclair's inability to diligently prosecute these claims, it is demonstrated that these claims have a modest value obtained by the Bankruptcy Trustee. The value is focused on bringing to an end Debtor-Sinclair's endless, meritless litigation. The "value" for Debtor-Sinclair is shown to be his desire to continue in his decades long endless attempts to relitigate issues he lost long ago.

### THE SETTLEMENT IS IN THE BEST INTERESTS OF CREDITORS AND THE BANKRUPTCY ESTATE

The court concludes that all four factors for approval of the settlement are satisfied. Debtor-Sinclair has demonstrated that these claims cannot be quickly and easily litigated and liquidated. Further, though a highly educated, very experienced attorney, Debtor-Sinclair has been unable to even assert these claims for more than a decade. This is not because Debtor-Sinclair did not have the ability to access state and federal courts. He has been litigating with Katakis et al. for more than

---

[8] This reference relates to the phrase, "you cannot squeeze blood from a turnip," when describing someone who does not have assets to pay financial obligations. *See Young v. Conejo Valley Sanitary Company*, 1 Cal. App. 3d 976, 979 (1969).

a decade in various courts.  However, in these battles Debtor-Sinclair has been the loser.

Debtor-Sinclair is not credible in his contentions that what was stated under penalty of perjury on Schedule B to be part of $6 Million in claims has grown to $40 Million.  From his conduct in this bankruptcy case, both as a party and a lawyer, Debtor-Sinclair has demonstrated a willingness to state whatever he believes to be in his interest—without regard to the accuracy or legal merits.  Debtor-Sinclair has attempted to have the court improperly vacate orders and judgments of other courts.  This was not because of an "error" or "mistake" given Debtor-Sinclair's self-admitted higher legal education and experience.

Debtor-Sinclair, though the court extended several opportunities over a four-month period, never could present the court with any credible, properly authenticated evidence to support his contention that he was "disabled."  The best was a generic note, purporting to be a doctor, stating a date that Debtor-Sinclair could return to "work/school."  The court further notes that the accident "coincidently" resulted in Debtor-Sinclair delaying discovery in the bankruptcy case after this court denied Debtor-Sinclair's requests to delay the discovery.[9]

---

[9]  When presented with his continuing failure to present any credible medical testimony of any disability in this case during the Summer, Fall, and into December 2015, Debtor-Sinclair offered the excuse that Dr. Basi (the doctor identified on the unauthenticated form excuses stating that Debtor-Sinclair needed to be excused from "work/school ") wasn't a knowledgeable doctor and had referred Debtor-Sinclair to a Dr. Aguliar to examine Debtor-Sinclair.  It was then argued by Debtor-Sinclair that the court should review what Debtor-Sinclair filed in January 2016 which would prove the disability.  This excuse, even if true, does not explain why a doctor, concerned about Debtor-Sinclair's mental abilities and medical condition would ignore the court's order in October 2015 and not come to court to provide such medical knowledge and testimony to corroborate such medical concerns.

The January 2016 filings by Debtor-Sinclair are found at Dockets 359 and 376.  The first is Debtor-Sinclair's opposition to a motion for him to be held in contempt and request for a disability continuance that was filed on January 8, 2016.  Dckt. 359.  This 30-page pleading consists of 4 pages of "opposition," then 26 pages of points and authorities, with extensive citations, quotations, and arguments.  No declaration of any doctor is provided.  This pleading merely continues Debtor-Sinclair's practice of telling the court what he wants, without any evidence or any doctor actually willing to come forward and provide any testimony the extensive citations, quotations, and arguments are inconsistent with a contention that Debtor-Sinclair was so "disabled" that he could not comply with the court's discovery order or that everything in his bankruptcy case should be stayed.

The Bankruptcy Trustee has done the best he can with what Debtor-Sinclair has given the Bankruptcy Trustee to work with in this case. Debtor-Sinclair has worked at cross-purposes with the Bankruptcy Trustee. Debtor-Sinclair failed to forge a working relationship to prosecute these claims if they were so valuable. Mrs. Sinclair, asserting to be a creditor with a financial stake in this case as well as a transferee, failed to take any action (potentially using assets transferred to her by Debtor-Sinclair) to make sure that these claims were prosecuted if they were so valuable. Dr. Machado, Debtor-Sinclair's sister, failed to take any action (potentially using assets transferred into the Richard Sinclair Trust and limited liability companies) to make sure that these claims were prosecuted if they were so valuable. The Sinclair Children (as transferees or beneficiaries of the Richard Sinclair Trust) failed to take any action (potentially using assets transferred into the Richard Sinclair Trust and limited liability companies) to make sure that these claims were prosecuted if they were so valuable.

Nobody, other than Debtor-Sinclair has asserted that the claims being settled have any higher value than the $40,000.00 obtained by the Bankruptcy Trustee from Katakis et al. Debtor-Sinclair's contentions and arguments that these assets have a clearly higher value are not credible.

**Consideration of Additional Offers**

At the hearing, the court announced the proposed settlement. No other offers were presented

---

The second pleading is titled "Status Report - Nuerosurgeon [sic]." Dckt. 376. This 12-page pleading begins with a 6-page declaration of Debtor-Sinclair stating that he met with a Dr. Aguilar. Debtor-Sinclair then proceeds to provide "testimony" about his asserted medical condition. Debtor-Sinclair then "testifies" about all the bad things done to him by Katakis et al. and their attorneys. No declaration or other evidence is presented by Dr. Aguilar or any other medical professional. As before, it is merely Debtor-Sinclair stating that he has a "disability" and everything should be put on hold because he so demands. Debtor-Sinclair then attaches a magazine article about brain injuries to support Debtor-Sinclair's arguments.

As with the prior contentions and continuing to this day, Debtor-Sinclair merely argues and demands, no evidence of any medical "disability" was provided to the court. Based on the (lack of) evidence presented, the extensive arguments and pleadings filed by Debtor-Sinclair, Dr. Machado (Debtor-Sinclair's sister) actively involved in this case and other family members having a financial interest in protecting their transfers and taking no action based on Debtor-Sinclair being "disabled," the court remains convinced that the "disability" was and is merely an improper litigation ploy by Debtor-Sinclair.

to the court.

**Clarifications in Order Granting Motion**

In the Supplemental brief and as stated at the hearing, Katakis et al. agreed to clarifications of the settlement terms to address points raised by the court in the tentative ruling and stated above. While some of the clarifications are stated in the Decision above, the court restates them here for the convenience of the court and parties:

A.    Proofs of Claims Nos. 4-1 and 26-1 are the only claims for Katakis et al. which will be asserted in this bankruptcy case.

B.    Katakis et al. will dismiss Adversary Proceeding 15-9007 upon consummation of the settlement.  There will remain the 11 U.S.C. § 523 actions for the 2003 State Court Action judgment and the District Court Judgment, if any, and the 11 U.S.C. § 727 Adversary Proceeding.

C.    The parties adopt the court's language used in the Decision above to describe claims of estate released in connection with the proposed 4th Amended Cross-Claim drafted by Debtor-Sinclair.

D.    Clarify that each of the Katakis et al. parties grant the release, and that the release is not merely for claims they hold "jointly."

E.    Capital Equity Management Groups I making the two $20,000.00 settlement payments to the Bankruptcy Trustee.

Upon weighing the factors outlined in *A & C Props* and *Woodson*, the court determines that the compromise is in the best interest of the creditors as set forth in this ruling.  The Motion is granted.

This Memorandum Opinion and Decision constitutes the court's findings of fact and conclusions of law in the granting of this Motion. Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052, 9014(c).

Counsel for the Trustee shall prepare an order approving the Motion and lodge said proposed order with the court.

Dated: January 09, 2017

By the Court

Ronald H. Sargis, Judge
United States Bankruptcy Court

39

# APPENDIX A

As stated in this Decision, the court concludes that Debtor-Sinclair is a highly educated, very experienced attorney who knows what he is doing and does what he intends. The actions taken by Debtor-Sinclair are not by mistake or accident, even when such are not warranted under the law or facts. Examples of representations by Debtor-Sinclair of his extensive legal and business knowledge stated to the court in just this bankruptcy case include the following:

A.    Debtor-Sinclair's thirty-five (35) page Opposition Statement, Dckt. 99, to the Katakis et al. motion to convert this case to one under Chapter 7 includes the following statements of Debtor-Sinclair's legal and business abilities:

    1.    "Debtor had a thriving law practice and $5 million in assets and a horrible Estate Tax problem he understood with his postdoctoral LLM in Taxation." Dckt. 99 at 3, 7, 11.

B.    Debtor-Sinclair's thirty-seven (37) page Opposition, Dckt. 87, to Katakis et al. motion to convert the case to one under Chapter 7 includes:

    1.    "Finally, Richard Sinclair is retaking possession of his Oakdale Home Office consisting of approximately 7800 sq ft; he is cleaning out the main floor and getting bids for the cost to convert it to an 8 bedroom, 8 person Senior Citizen's [sic] assisted living center. He has gone through pre-licensing with the State and they will view the house, probably in March." Dckt. 87 at 11 (showing sophisticated business knowledge).

    2.    "Debtor's revised plan provides for the rehabilitation of debtor's income earning abilities either as an attorney or in other areas. Debtor is a community college professor, was a builder and the President of a General contracting firm having built over 100 living units, a computer programmer, rancher and other professions." *Id.* at 15.

    3.    "Debtor had a thriving law practice and $5 million in assets and a horrible Estate Tax problem he understood with his postdoctoral LLM in Taxation. He first decided to give ½ of his inheritance to his kids." *Id.* at 16 and 19.

C.    Debtor-Sinclair's fourteen (14) page December 1, 2016, Status Conference Statement, Dckt. 488, includes the following:

    1.    "I, on the other hand, practiced tax, real estate and business law for 40 years, am still a pro-tem Judge of the Stanislaus County Superior Court, have an LLM in taxation from University of Miami, and a juris doctor from McGeorge School of Law, worked as a [sic] Administrative Law Judge for the State of California, a real estate salesman, my corporation was a licensed General Contractor, and I am listed in Who's Who in the World and Who's Who in America. I was a practicing attorney for 40 years, . . . ." Dckt. 488 at 2.

    2.    "Prior to that, I was aware of the federal estate tax starting at 48% after exemptions and have tried to keep my assets under the $1 to $3 million amount. In 1996 and 2001, I gave my interests in my inheritance at Sinclair

Ranch because it was worth about $6000 an acre and would eventually be worth many times more than that. I gave a great deal of my interest to my children. That interest was put in an LLC with my sister as the manager. She also owns a portion of that LLC as does my older brother Robert. I also gave my wife 40 acres for her security by 2001 because I had filed bankruptcy in 1994 due to my construction and real estate ownership, so that she would always be protected. That was put in another LLC where I was the manager. Eventually, when we separated, the LLC deeded her her interest." *Id.* at 3.

3.    "In the late 1990's and 2000's, I owned Las Palmas of Turlock which was a 30+ unit apartment complex worth more than $3 million which generated about $18,000 a month in rents, I also owned portions of Fox Hollow of Turlock after 2002, which was 35 three bedroom units and generated $25,000 a month and as previously stated, was worth $7.65 million in 2007. I owned an office at 1001 West F street in Oakdale, a thriving law practice that had more than $2 million in Receivables, plus /2 of our homes at 8212 Oak View Drive, Oakdale, and our home at 22734 BlackHawk Drive, Twain Harte, Ca." *Id.*

Examples of extensive and detailed legal arguments and authorities (whether they have merit or not), and litigation practices in this court by Debtor-Sinclair include the following:

A.    Opposition to Katakis et al. Motion to Convert Case to Chapter 7, Dckt. 87.  In this thirty-seven page pleading, Debtor-Sinclair includes:

1.    A Table of Contents listing ninety (90) cases which he cites and quotes extensively in making his arguments.

2.    An extensive discussion of the history of his litigation with Katakis et al. showing a good, established knowledge of the facts which he has been litigating for decades.

3.    An extensive, twelve (12) page discussion of fraud on a court and the ability to vacate judgments under the Federal Rules of Civil Procedure (Rule 60(d)) and other powers of a court.

B.    Debtor-Sinclair's Motion to Dismiss Chapter 11 Case, Dckt. 116.  In this seventeen (17) page pleading, Debtor-Sinclair includes:

1.    A Table of Contents listing thirty (30) cases which he cites and quotes extensively in making his arguments.

2.    A detailed discussion (seven pages), with extensive quotations and citations on the issue of voluntary dismissal of Chapter 11 cases by a debtor in possession.

C.    Debtor-Sinclair's eighteen (18) page Reply, Dckt. 125, to the Katakis et al. motion to convert this case to one under Chapter 7 includes:

1.    A Table of Contents listing thirty-one (31) cases which he cites and quotes extensively in making his arguments.

2.    Much of the legal authorities and arguments are merely recastings of the

original motion, but apparently restated for emphasis.

D.    Debtor-Sinclair's thirty-five (35) page Opposition Statement, Dckt. 99, to the Katakis et al. motion to convert this case to one under Chapter 7 includes:

    1.    Extensive recitation of decades of facts relating to the dispute with Katakis et al. and the various rights Debtor-Sinclair asserts he had and which are property of the bankruptcy estate.

    2.    A detailed explanation of federal law and Debtor-Sinclair's intention to vacate judgments in other courts. Dckt. 99 at 15–35.

E.    Debtor-Sinclair's twenty-one (21) page Motion for Protective Order, Dckt. 188, which includes:

    1.    Extensive points and authorities on protective orders in federal court.

F.    Debtor-Sinclair's thirteen (13) page Reply and Opposition Objection to Exemptions, Dckt. 452, includes:

    1.    Detailed discussion of Debtor-Sinclair's business dealings and various complex legal principles concerning rights which Debtor-Sinclair believes he has had, and the bankruptcy estate now has, to be enforced against Katakis et al.

    2.    Extensive review of California law concerning exemptions and case law interpreting and applying such statutes.

G.    Debtor-Sinclair's thirteen (13) page Opposition to Motion to Approve Compromise (Dckt. 487), which includes:

    1.    Detailed discussion of the law and statutes relating to the approval of compromises in bankruptcy proceedings.

H.    Debtor-Sinclair's thirteen (13) page Motion to Abandon Stanislaus Case 668157 (Dckt. 486), which includes:

    1.    Explanation that Debtor-Sinclair has prepared a fourth amended complaint in the state court.

    2.    A misstatement that this court made a determination that Katakis et al. violated Debtor-Sinclair's 5th and 14th Amendment Rights (which rights are not identified). Further, in purporting to state that the court issued a ruling determining issues in Debtor-Sinclair's favor, Debtor-Sinclair extensively cites to (and attached a copy of) only a portion of the court's tentative ruling, and only the portion which outlines the *arguments* made by Debtor-Sinclair, and not any tentative ruling or the actual final ruling of this court.

I.    Debtor-Sinclair's proposed fifty-two (52) page Fourth Amended Complaint ("4thAC") he seeks to file in Superior Court case no. 668157, Stanislaus County, (Dckt. 469), which includes:

    1.    Thirteen Causes of Action.

2.    Claims stated under state and federal law.

3.    The Causes of Action range over a twenty-year period.

4.    Statement that Debtor-Sinclair is "out of money."  4thAC ¶ 18.9.

5.    Whether the proposed Causes of Action have merit or not, the pleading demonstrates Debtor-Sinclair's legal knowledge and abilities.

J.    Debtor-Sinclair's seven (7) page motion to be filed in Superior Court case no. 668157 (Dckt. 470), which includes:

1.    Detailed discussion of California law for the filing of amended pleadings.

There is nothing in the court record to indicate that this extensive legal knowledge and ability are a new found education, nor something that Debtor-Sinclair had the ability to do and exercise over the past forty years but not now.  The court addresses in the Decision Debtor-Sinclair's contentions that during some of these periods he was "disabled" and the findings of this court and other courts concerning such asserted "disabilities."

**APPENDIX B**

***Fox Hollow of Turlock Owner's Association v. Mauctrst, LLC***, *et al.*,
E.D. Cal. No. 1:03-CV-05439, Dckt. 1184 ("Dist. Ct. Case 03-5439").

The District Court addressed the litigation practices of Debtor-Sinclair in a recent decision on a motion for new trial filed by Debtor-Sinclair. The ruling of the District Court judge includes the following:

A. "Throughout the long history of this case, multiple judges have sanctioned Defendants (Richard Sinclair in particular) for failure to follow rules and court orders." Dist. Ct. Case 03-5439, p. 3:20-21.

B. "Additionally, Judge Beck sanctioned Richard and Brandon Sinclair for not acting in good faith in trying to resolve the discovery dispute. Doc. 613. Richard Sinclair sought reconsideration of the order. Doc. 621. Judge Wanger denied reconsideration. Doc. 763." *Id.*, p. 4:11-14.

C. "The vast majority of Richard Sinclair's fraud on the court allegations involves the proceedings in the State Court Action." *Id.*, p. 6:15-16.

D. "Again, Richard Sinclair seeks to reinstate the 2007 Settlement. Doc. 1083, 20:17-19. The California courts in the State Court Action have already definitively determined that the 2007 Settlement is not enforceable. This court will not collaterally undermine that full and final decision." *Id.* at 16-20.

E. "The orders Richard Sinclair seeks relief from were imposed as litigation sanctions. While Richard Sinclair might not initially have been able to respond to the discovery requests due to health issues, **he has been given multiple opportunities over a period of years to comply with the discovery orders**. Instead, Defendants (and **Richard Sinclair in particular**) have **flouted the orders of the various District Judges and Magistrate Judges** assigned to this case. Monetary sanctions were imposed and had no effect." *Id.*, p. 7:12-17 (emphasis added).

F. "Richard Sinclair's failure to follow court orders is not limited to this court." *Id.* at 19-24.

G. "California State Bar Court Judge Pat McElroy . . . found Richard Sinclair guilty of four charges of professional misconduct . . . Judge McElroy stated

> [Richard Sinclair] asserted that beginning in 2008 he had four major skeletal surgeries and had to re-learn how to walk on various occasions. While respondent presented evidence of his medical history, including his four surgeries, **his last two surgeries were on March 11, 2011, and September 27, 2011, well before the present misconduct.** The note from the doctor as to the September 27, 2011 surgery states that respondent should not engage in work for ten days. . . . Daniel Durbin, an attorney for Katakis, gave reliable testimony in the present matter that **during the period of August 2010 through June 2011**, [Debtor-Sinclair] **filed 22** complaints, amended complaints, cross complaints, answers, or petitions; **filed 44** disclosure motions or applications, notices of appeal or removal, and

44

appellate briefs; **opposed 25** motions or applications; **made at least 27 court appearances**; and **conducted a 5-day jury trial**. As proof of the 5-day jury trial, Durbin presented court records. On the other hand, **[Debtor-Sinclair] claims to have no memory of a jury trial** in April 2011.

State Bar Court of California San Francisco Hearing Department, In the Matter of Richard Carroll Sinclair Member No. 68238, Case No 13-O-10657-PEM, July 28, 2015 Order, pages 28-29, publically available at http://members.calbar.ca.gov/courtDocs/13-O-10657-2.pdf." *Id.*, p. 7:19-28, 8:1-6.

H.   "Richard Sinclair's surgeries took place 2008-2011; as outlined above, his refusal to follow court orders took place after that time." *Id.* at 6-8.

I.   "Any failure to comply with the discovery orders was not due to a medical condition or maneuvering by Plaintiffs." *Id.*, p. 8:14-15.

**California State Bar Proceedings and Debtor-Sinclair's Disbarment**

Debtor-Sinclair was licensed as an attorney in the State of California from January 26, 1976 until August 27, 2015, when he was suspended from the practice of law until his disbarment on March 18, 2016. http://members.calbar.ca.gov/fal/Member/Detail/68238. The full decision of State Bar Court Judge Pat McElroy can be obtained at the California Bar website at the address above. The findings and conclusions are stated in a detailed Decision and Order of Involuntary Inactive Enrollment in State Bar Case No. 13-0-10657-PEM ("State Bar Decision"). Judge McElroy's findings and conclusions include the following:

A.   "The court finds, by clear and convincing evidence, that respondent is culpable of four of the seven counts of misconduct. In light of the serious nature and extent of [Debtor-Sinclair's] misconduct, as well as the aggravating circumstances, the court recommends that respondent be disbarred." State Bar Decision, p. 1.

B.   "In January 1994, respondent, through Sinclair Enterprises, asked to modify the condition requiring all building code revisions to be completed before the final map could be recorded. The City of Turlock denied the request a month later. [Debtor-Sinclair] wrote the City, stating '[t]here are sufficient funds within the homeowners association' to perform some of the modifications. This was a misrepresentation, as there was no homeowners association.[2]

[2] This court found respondent's explanation that he did not sign this letter and that he had no idea who signed it to be incredible. As noted below, the homeowners association was not actually formed until six years later." *Id.*, p. 4.

C.   "The court dismissed [Debtor-Sinclair's prior] bankruptcy after concluding respondent had filed it in bad faith, writing that respondent's 'egregious conduct in making the unauthorized post-petition transfers of the properties out of the Benbright estate to his individual bankruptcy after the meritorious motions for relief from stay

45

were filed has caused further delay, harassment, and increased costs to the secured creditors.'" *Id.*, p. 4–5.

D.    "Even though the required modifications were not completed, [Debtor-Sinclair], on February 20, 1998, filed a "Notice of Completion" of the [Fox Hollow] subdivision project. The notice stated that [Debtor-Sinclair] was the 'developer of said work' and the owner of the subdivision [notwithstanding the court finding that the evidence showed that Gregory Mauchley owned Fox Hollow]. At the civil and present trials, [Debtor-Sinclair] said he had no idea why his name is on the notice of completion.[5]

> [5] This court found [Debtor-Sinclair's] testimony on this subject to be disingenuous at best. Respondent's assertions before this court that he has no idea who filed the notice of completion or why he was listed as the owner of the subdivision were not credible." *Id.* p. 7.

E.    "At the civil trial, [Debtor-Sinclair] did not recall whether he disclosed to City of Turlock employees that the conditions imposed for approval of the subdivision had not been completed, testifying it was common to complete the requirements after the map was recorded.[6]

> [6] This court finds the validity of [Debtor-Sinclair's] testimony on this subject to be highly suspect." *Id.*

F.    "In 1995, [Debtor-Sinclair] formed Mauctrst for Mauchley as part of a tax plan. Mauchley was the owner and member manager of Mauctrst [15 Fox Hollow lots were transferred into Mauctrst]. [Debtor-Sinclair] was co-manager.[7] Respondent could not produce a signed operating agreement for Mauctrst.

> [7] In testifying at trial in this matter, [Debtor-Sinclair] denied any ownership of Mauctrst and stated that every once in a while he made a mistake and wrote 'member/manager.' This court finds [Debtor-Sinclair's] testimony on this subject lacked credibility." *Id.*, p. 8.

G.    Debtor-Sinclair filed a Chapter 11 bankruptcy case for Maucrst and the State Bar Judge recounts the following concerning Debtor-Sinclair's conduct in that case:

> "[Debtor-Sinclair] filed a chapter 11 bankruptcy petition for Mauctrst on July 1, 1999. The court appointed a chapter 11 trustee, whose status reports were critical of [Debtor-Sinclair's] management of Mauctrst. [Debtor-Sinclair] failed to timely file the required bankruptcy disclosure statements; he had not provided Mauctrst with an accounting of his services and compensation for over a year; and, since January 1998, he had been paid $150,000, including $20,000 in the 90 days before Mauctrst filed the bankruptcy petition.

> In addition, [Debtor-Sinclair] failed to account for the proceeds of two fire insurance claims, and over 50 cancelled checks and two bank statements were missing. Finally, [Debtor-Sinclair] failed to account to the trustee for $135,000 he had received from Mauctrst between August 1998 and June 1999." *Id.*, p. 9.

H.    The State Bar Judge's Conclusions include the following:

1.    "The evidence before this court demonstrates that [Debtor-Sinclair] engaged in a fraudulent real estate scheme involving the Fox Hollow complex,

including but not limited to: (1) creating the false appearance of a homeowners association and individually saleable lots; (2) seeking and obtaining loans secured by portions of Fox Hollow based on false pretenses and misrepresentations; (3) skimming off loan proceeds, dues collected in the name of the FHOA, rental income, and tenant deposits; (4) filing bankruptcies and lawsuits to try and delay foreclosures and/or keep the lots; and (5) providing false testimony and misrepresentations to the civil courts to conceal and perpetuate the scheme to defraud." *Id.*, p. 24.

2.    "By engaging in the scheme to defraud, including perpetuation of the scheme through an alter ego, [Debtor-Sinclair's] committed acts involving moral turpitude, dishonesty, and corruption, in wilful violation of Business and Professions Code, section 6160." *Id.*

3.    "This court agrees, noting that [Debtor-Sinclair's] misconduct spanned from 1994 through the underlying civil trial [Fox Hollow litigation]. During this time [Debtor-Sinclair] has consistently and repeatedly engaged in deceptive and improper conduct in an effort to procure personal financial gain." *Id.*, p. 30-31.

4.    "[Debtor-Sinclair's] actions demonstrate his indifference toward rectification or atonement for the consequences of his misconduct. Despite overwhelming evidence to the contrary, respondent maintains he did nothing wrong and sees himself as the victim. Further, [Debtor-Sinclair] has not taken any steps to rectify the harm he has caused. Consequently, [Debtor-Sinclair's] indifference toward rectification or atonement for the consequences of his misconduct warrants significant consideration in aggravation." *Id.*, p. 31.

5.    "Further, [Debtor-Sinclair's] misconduct and stalling tactics have resulted in a waste of judicial resources." *Id.*

6.    "[Debtor-Sinclair's] numerous and repeated instances of deception and fraud relating to the Fox Hollow property demonstrate that he is unable or unwilling to conduct himself in a manner consistent with settled standards of professional responsibility in this state. Based on his testimony and demeanor, there is little indication that [Debtor-Sinclair] has gained any insight and understanding regarding the present misconduct." *Id.*, p. 33.

The California Supreme Court issued the Order of Disbarment on February 17, 2016.

*Sinclair on Discipline*, S230942, 2016 LEXIS 3065 (2016).

# Instructions to Clerk of Court
### Service List - Not Part of Order/Judgment

**The Clerk of Court is instructed to** send the Order/Judgment or other court generated document transmitted herewith *to the parties below*.  The Clerk of Court will send the document via the BNC or, if checked  **XXXX**   , via the U.S. mail.

| Plan Administrators/Debtors | Attorney for the Plan Administrators/Debtors |
|---|---|
| **Bankruptcy Trustee** (if appointed in the case) | Office of the U.S. Trustee<br>Attn: Allen Massey, Esq.<br>Robert T. Matsui United States Courthouse<br>501 I Street, Room 7-500<br>Sacramento, CA 95814 |
| Aaron A. Avery<br>2150 River Plaza Dr #450<br>Sacramento, CA 95833 | Gary Farrar<br>PO Box 576097<br>Modesto, CA 95357 |
| D. Greg Durbin<br>7647 North Fresno Street<br>Fresno, CA 93720 | Hilton Ryder<br>7647 North Fresno Street<br>Fresno, CA 93720 |
| Dr. Kathryn Machado<br>620 Denton<br>Hickman, CA 95323 | Jessica Dorn<br>201 Needham Street<br>Modesto, CA 95354 |
| Holly Coates<br>201 Needham Street<br>Modesto, CA 95354 | |